# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-2882

_____

Thomas W. Winslow

*Plaintiff - Appellant*

v.

Richard T. Smith, in his official and individual capacities; Burdette Searcey, Dep., in his official and individual capacities; Gerald Lamkin, Dep., in his official and individual capacities; Jerry O. Dewitt, Sheriff, in his official and individual capacities; Wayne R. Price, PhD., in his official and individual capacities; Gage County Attorney's Office, a Nebraska political subdivision; Gage County Sheriff's Office, a Nebraska political subdivision; County of Gage, Nebraska, a Nebraska political subdivision

*Defendants - Appellees*

_____

No. 11-2883

_____

James L. Dean

*Plaintiff - Appellant*

v.

Richard T. Smith, in his official and individual capacities; Burdette Searcey, Dep., in his official and individual capacities; Gerald Lamkin, Dep., in his official and individual capacities; Jerry O. Dewitt, Sheriff, in his official and individual capacities; Wayne R. Price, PhD., in his official and individual capacities; Gage County Attorney's Office, a Nebraska political subdivision; Gage County Sheriff's

Office, a Nebraska political subdivision; County of Gage, Nebraska, a Nebraska political subdivision

*Defendants - Appellees*

_____

No. 11-2884

_____

Kathleen A. Gonzalez

*Plaintiff - Appellant*

v.

Richard T. Smith, in his official and individual capacities; Burdette Searcey, Dep., in his official and individual capacities; Gerald Lamkin, Dep., in his official and individual capacities; Jerry O. Dewitt, Sheriff, in his official and individual capacities; Wayne R. Price, PhD., in his official and individual capacities; Gage County Attorney's Office, a Nebraska political subdivision; Gage County Sheriff's Office, a Nebraska political subdivision; County of Gage, Nebraska, a Nebraska political subdivision

*Defendants - Appellees*

_____

No. 11-2903

_____

Ada Joann Taylor

*Plaintiff - Appellant*

v.

Richard T. Smith, in his official and individual capacities; Burdette Searcey, Dep., in his official and individual capacities; Gerald Lamkin, Dep., in his official and individual capacities; Jerry O. Dewitt, Sheriff, in his official and individual capacities; Wayne R. Price, PhD., in his official and individual capacities; Gage

County Attorney's Office, a Nebraska political subdivision; Gage County Sheriff's Office, a Nebraska political subdivision; County of Gage, Nebraska, a Nebraska political subdivision

*Defendants - Appellees*

————————

Appeal from United States District Court
for the District of Nebraska - Lincoln

————————

Submitted: May 15, 2012
Filed: October 15, 2012 (CORRECTED: October 29, 2012)

————————

Before MURPHY, BENTON, and SHEPHERD, Circuit Judges.

————————

SHEPHERD, Circuit Judge.

Plaintiffs Ada Joann Taylor, Thomas Winslow, James Dean, and Kathleen Gonzalez (collectively "Plaintiffs") were convicted in 1989 for participating in the 1985 rape and murder of Helen Wilson in Beatrice, Nebraska. However, in 2008, DNA testing established that the semen and type B blood found in Wilson's apartment were from Bruce Allen Smith, an individual who had no connection to Plaintiffs. After receiving full pardons from the Nebraska Pardons Board, Plaintiffs individually filed causes of action pursuant to 42 U.S.C. § 1983 against the county prosecutor and members of the sheriff's department (collectively "Defendants") who investigated the Wilson murder and against Gage County, Nebraska. As the basis of their lawsuit, Plaintiffs contend Defendants violated their rights to due process under the Fifth and Fourteenth Amendments by recklessly investigating the Wilson murder and by coercing Plaintiffs to plead guilty. At the conclusion of discovery, the district court granted Defendants' motion for summary judgment based on qualified and absolute immunity, dismissing Plaintiffs' claims. Plaintiffs appeal, arguing the

district court erred in its evidentiary rulings and in granting Defendants' motions for summary judgment.

Applying de novo review, we conclude that the district court erred by failing to grant all reasonable inferences to Plaintiffs and that the evidence is sufficient to support Plaintiffs' claims that their rights to fair criminal proceedings were violated as the result of a reckless investigation and Defendants' manufacturing of false evidence. The district court did not err, however, in its determination that there was insufficient evidence to support Plaintiffs' claims that their guilty pleas were unconstitutionally coerced. Additionally, the court did not err in granting absolute immunity to the county prosecutor. We thus affirm in part and reverse in part.

## I. Background

Helen Wilson's body was discovered in her apartment in Beatrice, Nebraska, on February 6, 1985. She had been raped and murdered. The Beatrice Police Department ("BPD") took the lead in opening an investigation into the murder. The BPD failed to charge anyone in the case, and the case remained unsolved.

Burdette Searcey was employed as an investigator with BPD from 1977 to 1982, but by 1985 he had left the force and was working as a farmer. After securing the permission of Wilson's daughter, Searcey began his own independent investigation into the Wilson murder. Searcey interviewed a number of former confidential informants who assisted him in identifying several persons who frequented the area where the Wilson homicide occurred. At that time, Searcey identified Joseph White, Thomas Winslow, Joann Taylor, Cliff Shelden, Mark Goodson, Beth Johnson, Deb Shelden, and Charlotte Bishop as persons of interest. Searcey believed that the Wilson murder had been committed by multiple persons, including White, Taylor, and Winslow.

-4-

In 1987, Jerry DeWitt became sheriff of Gage County and hired Searcey as a deputy sheriff. DeWitt and Richard Smith, who was the Gage County attorney, held a series of meetings concerning Searcey's previous investigative efforts. In January 1989, DeWitt and Smith gave Searcey permission to commence an official investigation into the Wilson murder. Gage County sheriff's deputies Gerald Lamkin and Wayne Price assisted in the investigation.

Lisa Podendorf was Searcey's lead witness. Podendorf claimed that on February 6, 1985, Taylor confessed to Podendorf that Taylor, along with Joseph White, murdered Wilson. Podendorf repeated this account in her recorded statement with Searcey in January 1989. Podendorf also claimed in the interview that she saw Taylor, Winslow, White, and Johnson get out of a car near Wilson's apartment on the night of Wilson's murder. Podendorf indicated that Taylor's confession came at 7:30 a.m., as Taylor and Podendorf observed several police cars at the apartment complex where Wilson's body was found. Searcey was aware that Wilson's body was not discovered until approximately 9:00 a.m., and apparently chose to overlook this discrepancy in Podendorf's testimony.[1]

Searcey interviewed Winslow on February 13, 1989, while Winslow was in custody for an unrelated felony assault charge. Searcey had previously interviewed Winslow during the course of his private investigation in 1985. In 1985, Winslow told Searcey that he was at work on the night of the Wilson murder. Searcey found this alibi was false because Winslow's supervisor indicated that Winslow had not come in to work on February 5, 1985. During the 1989 interview when Searcey confronted Winslow with his previous alibi, Winslow admitted he skipped work on the night of the Wilson murder. Although he continued to deny any involvement in

---

[1]Searcey also overlooked the discrepancy in Podendorf's claim that she saw Johnson at Wilson's apartment complex. Searcey had previously credited Johnson's alibi that she was with her parents on the night in question.

the murder, Winslow told Searcey he had loaned his car to Taylor, White, and Cliff Shelden on the night of the Wilson murder. Winslow claims he made this statement to Searcey after "Searcey had convinced me that my car was involved in the area." Winslow also claims he named Taylor and White because Searcey mentioned them before Searcey began recording the interview. Searcey's February 28, 1989 report of his interview with Winslow recounts Winslow's statement that he loaned his car to Taylor and White but omits mention of Cliff Shelden. Searcey had spoken to Cliff in 1985 and had accepted Cliff's alibi that he was in the hospital on February 5, 1985.

On February 25, 1989, Searcey interviewed Charlotte Bishop. Bishop stated that on the morning after the Wilson murder Taylor admitted that she was involved but did not name any other parties. The transcript of Bishop's interview indicates that her recollection of events was very poor; for example, she could not remember the month in which the Wilson murder occurred. After Searcey asked Bishop whether she remembered seeing police at the scene of the crime, Bishop indicated she saw police at Wilson's apartment complex on the night the murder occurred. As with Podendorf, Bishop's recollection of when police arrived was in error.

On March 14, 1989, Searcey finalized a sworn affidavit for an arrest warrant for Taylor and White. That same day, Searcey, DeWitt, and Smith traveled to Lincoln, Nebraska, to take a statement from Winslow that had been prearranged by Winslow's counsel. Winslow believed that providing Searcey with the statement would help him in his unrelated assault case, because Searcey told Winslow he would persuade the judge to release Winslow on a PR bond.

In his initial statement, Winslow claimed that on the night of February 5, 1985, he, Taylor, and White drove Winslow's car around Beatrice. Winslow recounted that during their drive, Taylor and White discussed robbing an old lady. Winslow said that Taylor and White dropped him off at Bishop's apartment and returned his car to his apartment the following morning. Searcey then informed Winslow that Winslow

had been seen getting out of his car along with Taylor, White, and Johnson at the apartment building where the homicide took place. Winslow agreed that this was true and that he had failed to mention it because he did not want to be connected to the crime, but Winslow denied any other involvement. Searcey expressed his disbelief in Winslow's denial. At this juncture, there was a 44-minute break in Winslow's interview during which Winslow met with his attorney. When the interview resumed, Winslow changed his story and agreed that he, Taylor, White, and Johnson went into Helen Wilson's apartment. Winslow stated that Taylor and White attacked Wilson, and that he panicked and left with Johnson. In recounting his interview with Searcey, Winslow stated that Searcey would signal his approval or disapproval of certain responses through body language: "He would move his papers and slap them down on the table when he disapproved. And when he approved, he would move them closer to him. And he would smile and gesture[]."

Taylor was arrested on a fugitive warrant in North Carolina on March 15, 1989. Before any Defendant talked to Taylor, Taylor admitted to local law enforcement in North Carolina that she had been present during the Wilson homicide. Searcey and BPD Sergeant Ralph Stevens traveled to North Carolina on March 16, 1989, and interrogated Taylor. Although Taylor confessed to being present at the Wilson murder, she stated that she only admitted her involvement after North Carolina officials told her she was there. Taylor could not recall basic facts about the Wilson homicide, such as the type of building that Wilson lived in and what time of day the crime occurred. Other parts of her testimony call into question Taylor's mental health, both during the interview and in 1985: she made multiple references to the fact that she had a personality disorder that was not being treated; she abused drugs and alcohol in 1985; she had previously attempted suicide; and she intended to inflict bodily harm on herself. Other statements signaled that Taylor was out of touch with reality in 1985, including her statement that she could not remember "much of '85 at all" and that she once believed that White was her father, even though White was only a year older than her. Taylor indicated that an individual named "Lobo," an alias

established for White, committed the murder. Taylor also stated that another male was involved, but she did not remember the identity.

In response to a series of leading questions from Searcey and Stevens, Taylor began to give testimony more in line with the evidence found at the Wilson crime scene. Searcey asked Taylor to corroborate that she had confessed to Podendorf and Bishop, but Taylor initially denied ever talking with anyone about the murder. Searcey continued to pressure Taylor into admitting that she had confessed to Podendorf and Bishop. When the interview resumed after a break, Taylor agreed that she may have discussed the Wilson murder with Podendorf and Bishop. Taylor also agreed to a number of suggestions offered by Searcey and Stevens: that she wrote a letter to Cliff Shelden admitting her role in the crime; that the site of the murder was an apartment building and not a house; that White performed a trick with money wherein he ripped the money in half;[2] and that there was an additional person, "Beth," present during the murder. Although Stevens and Searcey asked a number of leading questions that included descriptions of Winslow, Taylor could not supply the name of the other male that she said assisted in killing Wilson.

Taylor waived extradition, and she was brought back to Beatrice and booked into the Gage County Jail. In subsequent interrogations, Searcey continued to suggest details of the crime to Taylor, including supplying a photograph of Winslow in a lineup. Taylor's account of how the event happened shifted each time that she told her story.

After Taylor identified Winslow as a participant in the crime, Searcey drafted an affidavit for an arrest warrant for Winslow. Winslow was arrested and booked into

---

[2]A BPD officer informed Searcey that one half of a five dollar bill was found at the scene of the Helen Wilson murder. As a result, several of the suspects were asked whether they recalled White doing a trick in which he ripped currency in half.

the Gage County Jail. At that time, Winslow recanted his previous statement that he was a witness to the Wilson murder and instead fashioned a version of his story in which Taylor and White returned to his apartment with blood on their clothes. Winslow also indicated that Johnson may have witnessed the Wilson homicide. When Searcey confronted Winslow with his various statements, Winslow stated that "this story is the true one and if you don't want to believe it that's fine. I'll go back to my cell, I feel better now because it's off my chest."

Johnson gave a voluntary statement to Searcey on March 18, 1989. Johnson indicated that on the night of February 5, 1985, she spent the evening watching television with Taylor, Winslow, and Bishop at Bishop's apartment. Also on March 18, Searcey and Stevens traveled to Del City, Oklahoma, to interview Mark Goodson. Goodson gave a voluntary statement on March 19 in which he stated he was not involved in the Wilson murder. However, Goodson claimed that he called Taylor in 1985 when she was in North Carolina and that she admitted to him that she and White had murdered Wilson.

By mid-March, Defendants had arrested Taylor, Winslow, and White as suspects. Biogenetic samples were taken from Taylor and Winslow for testing; neither was a positive match for the type B blood found at the crime scene.

On March 24, 1989, Searcey and Stevens interviewed Deb Shelden. According to Stevens's report of the interview, Deb indicated that her husband, Cliff Shelden, told Deb that he received a letter from Taylor admitting Taylor's involvement in the murder. Stevens's report recounts that Deb did not read the letter and that the letter may have mentioned White. Searcey's report of Deb's statement differed, however, as he recorded Deb as saying that she read the letter herself and that it stated that Taylor and White were responsible for the murder.

On March 25, 1989, Searcey and Stevens took a recorded voluntary statement from Darren Jon Munstermann, who indicated that, at the time of the Wilson murder, he was residing with Taylor, Bishop, and Cliff Shelden. Munstermann stated that he had no knowledge of the Wilson homicide and that he was at home on the evening of February 5, 1985. Munstermann initially stated that he saw his three roommates the next day and that none of them acted unusual. Munstermann also stated that Taylor indicated her desire to move back to South Carolina to be with family. In response to this statement, Searcey began to question Munstermann about Taylor's desire to return to South Carolina, including whether Taylor was in a hurry to leave town, whether she was "antsy," whether she was acting abnormally, and whether Munstermann heard any comments from Taylor before she left town. Munstermann later remembered that Taylor acted "antsy" and that she "made up an excuse to leave town." When Searcey asked whether Munstermann thought Taylor's reason for leaving town might have been because Taylor was involved in the Wilson homicide, Munstermann agreed.

Cliff Shelden claimed he also had information relating to the Wilson murder. Cliff had previously offered information to a detective in the Lincoln Police Department on two previous occasions. In November 1988, Cliff stated that he thought White and Goodson were responsible for the rape and murder. In December 1988, Cliff pointed to Taylor, White, and Goodson. Searcey and Lamkin interviewed Cliff at the Lancaster County Correctional Center on April 12, 1989. After three and a half hours of interrogation, Cliff gave a recorded statement. In the statement, Cliff claimed that he received a letter from Taylor three to four months after the Wilson homicide in which Taylor admitted to participating in the homicide with Winslow and White. Cliff also stated that Winslow had told him about the Wilson murder, and that Taylor, White, Winslow, and Deb Shelden were present. Searcey's report of the interview prepared on April 20, 1989, recounts Cliff as stating that the homicide may possibly have involved James Dean, but Cliff makes no such statement in the transcript of the interview.

Searcey and Lamkin conducted a second interview of Deb Shelden on April 13, 1989. In the recorded portion of her interview, Deb indicated that she was present at the Wilson murder with Taylor, White, and Winslow. Deb stated that she watched the assault and murder, and that Taylor, Winslow, and White all played an active role in the homicide. Deb indicated that she hit her head and began bleeding after she was pushed by White. Following her interview, Deb was arrested and placed in the Gage County Jail. On April 14, 1989, after Deb Shelden allowed Defendants to obtain biogenetic samples, she submitted to a third interview. During this interview, Deb indicated that Dean was also present at the Wilson murder.

On April 13 or 14, 1989, Searcey drafted an affidavit for an arrest warrant for Dean. The court issued a warrant for Dean's arrest on April 14, and Dean was arrested and booked into the Gage County Jail on April 15. Biogenetic samples were taken from Dean at that time, which revealed that Dean's blood type was O negative. When questioned by Searcey and Lamkin, Dean denied any knowledge as to the Wilson homicide. When Dean stated that he wanted a lawyer, the deputies continued asking Dean questions.

On April 16, Searcey, Lamkin, DeWitt, and Smith interviewed Dean for over two hours. As before, Dean repeatedly requested the presence of counsel and denied any knowledge of or participation in the crime. One of the Defendants responded that Dean "did not need a lawyer and . . . needed to tell them what happened." Searcey, Lamkin, and DeWitt conducted a third interview for three hours on April 17. During this interview, Dean was told that Taylor, Deb Shelden, and Kathy Gonzalez had all implicated him in the case. Dean was arraigned on April 17 and was appointed counsel at that time. However, Searcey, Lamkin, DeWitt, and Smith continued to talk to Dean outside the presence of his counsel on numerous occasions. Defendants advised Dean that if he did not cooperate, he would get the electric chair. Dean took

a polygraph test on April 29, and the polygraph examiner reported that Dean was being deceptive.[3]

On May 2, 1989, Dean had a consultation with Price. In addition to being a commissioned deputy sheriff with the Gage County Sheriff's Office, Price served as the Gage County police psychologist. During his consultation, Dean again denied any involvement in the Wilson homicide. But when Price told Dean about the

---

[3]In reviewing the polygraph examiners' reports with respect to Dean, Deb Shelden, and Gonzalez, the district court observed that the examiner, Paul Jacobson, "was independent of the defendants and law enforcement more generally." After reading the polygraph reports, however, we cannot agree. Rather than merely giving an objective report as to whether Dean's answers were probative of truthfulness, Jacobson can be understood to give his subjective belief that he was "fully convinced that [Dean] has knowledge he is not sharing and will not change his story until he is backed in to a corner." Jacobson went further in the report to opine as to his own theories of the case:

> I know that no prosecutor or defense attorney wants some innocent person falsely accused and I feel I have failed a bit in not getting more out of [Dean] than I did. However, at this stage, much is based on only what has been said by Debra Shelden, whose statement leaves much to be desired. I really can't see why she would be putting a false accusation on [Dean] unless she was trying to cover up for someone else, it appears more likely that she was not wanting to tell on [Dean].

Jacobson then suggests that it would be a "wise choice" to examine Deb Shelden, and that he "would do it for half my normal price since the case preparation, review of reports, etc. would not require all that extra time." In a later report of an interview of Gonzalez, Jacobson opines to investigators that they "are probably playing a waiting game with Kathy. When she finds out about the blood test and that she is in the big leagues, it might be a whole different story." We find that these sorts of statements by Jacobson allow for a reasonable inference that Jacobson was not acting as an independent expert, but instead, at the very least, was seeking to get results to inculpate the subjects of the investigation.

polygraph's indication that Dean was being deceptive, Dean began to doubt himself. Price counseled Dean that Dean was subconsciously aware of his role in the Wilson murder and that "continuing supportive therapy" would help him to recall his repressed memories. Dean agreed to continue therapy sessions with Price. In subsequent meetings with Defendants, Dean was shown photographs and videos of the crime scene. Searcey and Lamkin also escorted Dean to the apartment where Helen Wilson had been murdered.

On May 8, 1989, in conjunction with a plea agreement, Dean gave a recorded statement to DeWitt and Smith in the presence of his counsel. In his statement, Dean indicated he was present at the Wilson homicide along with Taylor, Winslow, White, and Deb Shelden. However, Dean could not recall why they went to Wilson's apartment, and he did not remember seeing anyone touch Wilson. When DeWitt asked Dean if anyone else was present, Dean said not that he could remember. But Dean agreed with DeWitt's suggestion that someone else could have been present. When Smith asked Dean why he was now admitting his involvement in the crime, Dean answered:

> Well I, I feel that I remembered it in my sleep. I obviously had some kind of a subconscious block or something I don't know what it was for sure and I couldn't remember and I thought I was telling the truth naturally and I said I was not there.

Searcey and Lamkin interviewed Dean again on May 10, 1989, in the presence of Dean's counsel. Unlike his statement from two days earlier, Dean recounted going to Wilson's apartment with Taylor, Winslow, White, and Deb Shelden, and that it was Taylor, Winslow, and White who "grabbed" Wilson in a "gentle manner." Dean recalled seeing someone slap Wilson, but he could not remember who it was. Although Searcey and Lamkin asked a number of leading questions, Dean could not remember any relevant details of the crime. However, Dean agreed with Searcey's suggestion that Wilson was being "violently mistreated." Dean repeatedly indicated

-13-

that his memory was lacking: "I can't remember you know like I said I got this all [in] a dream you know and I'm just telling you bits and pieces of what I can tell you like you guys wanted to know you know."

On May 17, 1989, Searcey and DeWitt interviewed Dean yet again in the presence of Dean's counsel. In this interview, Dean stated that he witnessed Taylor, Winslow, and White sexually assaulting Wilson. Dean also added remembering seeing another person in the doorway of the apartment. Although Dean gave a physical description, he could not remember the gender or name of that person. Dean claimed he thought the other person was a woman and that he had "an idea" who she was, but he did not want "to put a wrong name in there and get you guys in trouble."

On May 17, 1989, Dean entered a plea of guilty to an amended information charging him with aiding and abetting second-degree murder. Before accepting Dean's plea, the court asked Smith what the nature of the evidence would be that the government would present at trial. Smith responded that, at trial, the government would rely on the testimony of Deb Shelden and on Dean's confession to investigators:

> MR. SMITH: Please the Court, your Honor, Debra K. Sheldon [sic] if called to testify, she would indicate that on the evening hours of February 5, 1985, she along with the defendant standing before the Court today, James L. Dean, along with several other individuals went to the location of Apartment Number 4, 212 North Sixth Street, Beatrice, Gage County, Nebraska.
>     We would also advise the Court that Deputy Burdette Searcey, if called to testify, he would indicate that Mr. Dean after being mirandized has admitted the same to him. Both individuals, both Mr. Dean's statement and Ms. Sheldon's [sic] testimony would be that the apartment was rented by Helen L. Wilson, a 68-year-old white female, and that Deputy Searcey would testify she was found at approximately 9:15 a.m. on 2-6-85, and that she was dead.

-14-

Ms. Sheldon [sic] would testify that entry was gained to the apartment with Mr. Dean and several other individuals by force. The door was knocked on, Mrs. Wilson responded by opening the door. The door was then pushed back forcibly sending Mrs. Wilson into the apartment. Mr. Dean has also advised the deputy that at that point Mrs. Wilson was struck by one of the other individuals, and almost went to the floor at that point.

Ms. Sheldon's [sic] testimony would further go on that the door was shut, she observed the homicide of Helen Wilson. Mr. Dean has also stated to Deputy Searcey that he observed the homicide of Helen Wilson. They both observed -- in both their statements she would testify and the deputy would testify that Mr. Dean had indicated they observed a sexual assault being committed upon Helen Wilson prior to and during the homicide. Mrs. Wilson was attempting to struggle and resist. However, she was being forcibly held at the time, and that she was also -- the sexual assault was very violent in nature.

. . .

Ms. Sheldon [sic] would testify that she observed one of the other individuals place a pillow over Mrs. Wilson's face, and at some point the struggling stopped from underneath the pillow and the individual was deceased.

Debra Sheldon [sic] also would indicate that the reason they went to that location was that they were looking for money. After the death money was also sought, and it was believed by her that one of the other individuals indicated they had found money. She indicates in her statement that the defendant Mr. Dean was suggesting places to look for the money at that time to see if it can be recovered.

Debra Sheldon [sic] and Mr. Dean would indicate entry was forcibly gained to the apartment. Mr. Dean was told by one of the other participants to shut up about what had occurred, and that all these events did take place in Gage County, Nebraska on or about the date of February 6, 1985.

Mr. Dean's statement, along with Ms. Sheldon's [sic] statement, would indicate they entered probably the very late evening hours of February 5, and left during the early morning hours of February 6.

After Smith concluded outlining the evidence that would be presented at trial against Dean, the court asked Dean and Dean's counsel if they wanted to tell the court anything. Dean replied, "No, sir." His counsel stated that he thought "the summary that's been recited by the county attorney fairly well sets forth the facts." The court then asked Dean: "Did you participate in the events that the county attorney has outlined, Mr. Dean?" Dean responded, "Yes."

On May 18, 1989, Searcey requested a picture of Gonzalez from the BPD. On May 24, 1989, Searcey interviewed Dean again in the presence of DeWitt and Dean's counsel. In this interview, Dean stated that he now remembered Gonzalez was present in the apartment and that she had been injured during the Wilson altercation. Also on May 24, Searcey and Lamkin interviewed Deb Shelden in the presence of her counsel. Like Dean, Deb stated that she now remembered seeing Gonzalez present in Wilson's apartment and that Gonzalez had a bloody nose. Deb indicated that she did not know Gonzalez and had forgotten about her until she had a nightmare. Deb further stated that she identified Gonzalez from a photo after asking Searcey to show her a picture that matched the characteristics of the woman she saw in her dream.

On May 25, 1989, Searcey, DeWitt, and Lamkin traveled to Denver, Colorado, to arrest Gonzalez pursuant to an arrest warrant issued by the court. Gonzalez repeatedly indicated that she could not recall being present during the Wilson murder. The next day, Gonzalez was transported back to Beatrice, where she gave biogenetic samples for testing, and was booked into the Gage County Jail. Price interviewed Gonzalez at that time. Gonzalez indicated that she had no memory of being present during the Wilson homicide. Gonzalez asked Price to hypnotize her so that she could recall being present, but Price refused. Price told Gonzalez that another witness charged with the crime had implicated Gonzalez. When Gonzalez asked Price how she could refresh her memory, Price told Gonzalez that she would remember if she relaxed and that her memories might return to her in dreams. When Gonzalez asked Price what would happen if she did not remember being involved, Price responded,

-16-

"[T]hen it's up to a court to decide . . . ." Price also told Gonzalez that if she were "there and not participating" at the Wilson homicide it would be "a very different situation" than if she were "there participating." Price then asked Gonzalez whether White would implicate her if it meant saving himself, and Gonzalez agreed White might do such a thing. Price told Gonzalez that

> the important thing is the odds are at this time it looks like you were in but did in fact block it. With two people pinpointing you in the event of [sic] each other, a good chance. And if you can help you out by remembering it will help you . . . . We don't want you held responsible for anything you didn't do and you know I have no idea of what uh [White] or [Taylor] and Winslow are going to say about you.

Price indicated that he would work with Gonzalez to help her recover her blocked memory. When Gonzalez's blood test results came back, it indicated that she had type B blood, but that her blood differed by one genetic marker from the blood found at the crime scene. Defendants told Gonzalez that the test results showed a 100% match.

Defendants continued to interview Dean. On June 7, 1989, Searcey interviewed Dean in the presence of DeWitt and Dean's counsel. Dean stated that, while he was riding along with the other suspects to Wilson's apartment, someone mentioned robbery. Dean also stated that Gonzalez suddenly appeared in the hall in front of their group as they made their way to Wilson's apartment. On June 23, Lamkin interviewed Dean in the presence of Dean's counsel and offered another statement about the group's plan to rob Wilson and about Gonzalez's alleged injury. On July 16, Dean supplied further new information in an interview with Lamkin in the presence of his counsel, including that Dean, Taylor, Winslow, White, and Cliff Shelden had a conversation a week before the Wilson homicide discussing stealing money from an old lady. When Dean began discussing the night of February 5, 1985, Lamkin asked Dean about the seating arrangement. Dean replied:

-17-

I remember it distinctly but I . . . kind of got ruined on it because when you guys were questioning me that the day after you arrested me on this, you showed me [a] diagram. You know you remember the diagram you showed me of the seating arrangement you had a note pad similar to mine a legal note pad and you said this is the way you guys were seated, one of you did I don't remember if it was your or [Searcey] but I do remember the seating arrangement, you want me to go ahead and tell ya I can.

Dean also added details about seeing Gonzalez bleeding in Wilson's apartment, seeing White carrying a stack of money in his hand, and hearing White tear a five dollar bill in half.

On September 1, 1989, Taylor pled guilty to "caus[ing] the death of Helen Wilson intentionally, but without premeditation." On October 5, Gonzalez entered a plea of nolo contendere to the charge of aiding and abetting second-degree murder. On November 9, White was found guilty after a jury trial of first-degree felony murder. Taylor, Dean, Gonzalez, and Deb Shelden all testified against White at his trial. Winslow refused to testify. On December 8, Winslow withdrew his not guilty plea and entered a no contest plea to a charge that he did "aid, abet, procure or cause another to cause the death of Helen Wilson intentionally, but without premeditation." White was sentenced to life imprisonment. Winslow was sentenced to fifty years imprisonment. Taylor received a sentence of forty years imprisonment. Dean and Gonzalez both received ten-year prison terms.

In 2008, DNA testing revealed that the blood and semen collected from Wilson's apartment matched Bruce Allen Smith, a person wholly unconnected to the Plaintiffs. As a result of this new testing, the Nebraska Pardons Board granted Plaintiffs full pardons.

A more thorough development of the facts of this case may be found in the background section prepared by the district court, from which we have borrowed heavily for our own overview of the facts herein. See Dean v. Smith, 805 F. Supp. 2d 750, 756-834 (D. Neb. 2011). Although Plaintiffs contend the district court's narrative is based on Defendants' version of events, we do not discern any facts included in the district court's background that are unsupported by the evidence. We do, however, disagree with certain inferences drawn by the district court from this evidence, as demonstrated by our characterization of some of the background facts and by our analysis below.

## II. Qualified Immunity

At the heart of their appeal, Taylor, Winslow, Dean, and Gonzalez argue the district court erred in holding that Defendants did not violate clearly established Fourteenth Amendment due process rights. "Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We review de novo summary judgment where granted on the basis of qualified immunity." Coates v. Powell, 639 F.3d 471, 475-76 (8th Cir.) (internal citation omitted), cert. denied, 132 S. Ct. 412 (2011). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008).

"Qualified immunity shields government officials from [personal] liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009). Evaluating a claim of qualified immunity requires a "two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and

-19-

(2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. at 496 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). "The defendants are entitled to qualified immunity unless the answer to both of these questions is yes." McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012). A court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis to take up first. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

## A. Violation of a Constitutional Right

We begin our analysis by discussing the contours of the constitutional right at issue. Plaintiffs' claims are founded in the Fourteenth Amendment right to due process.[4] The Due Process Clause of the Fourteenth Amendment provides that "[n]o State . . . shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To breach the shield of qualified immunity by establishing a "violation of substantive due process rights by an . . . official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the . . . official was shocking to the 'contemporary conscience.'" Flowers v. City of Minneapolis, 478 F.3d 869, 873 (8th Cir. 2007) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

---

[4]Plaintiffs also assert that their claims are based in the Fifth Amendment, presumably in its protection against self-incrimination. Such a claim fails, however, because Plaintiffs did not proceed to a criminal trial. "Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs." Chavez v. Martinez, 538 U.S. 760, 767 (2003) (plurality opinion) (internal citations omitted); see also id. at 779 (Souter, J., concurring) (stating that where claim is based on outrageous conduct of police in questioning of suspect, "[t]hat claim, . . . if it is to be recognized as a constitutional one that may be raised in an action under § 1983, must sound in substantive due process").

In the instant case, Plaintiffs' substantive due process claims are derived from their liberty interest in fair criminal proceedings. See Wilson v. Lawrence Cnty., 260 F.3d 946, 956 n.8 (8th Cir. 2001). Plaintiffs claim their right to a fair proceeding was violated in three separate respects. First, they claim that Defendants recklessly investigated the Wilson murder. Second, they claim that Defendants conspired to manufacture false evidence to coerce Plaintiffs to plead guilty to a crime they did not commit. Finally, Plaintiffs claim their guilty pleas were achieved by coercion.[5] We address the first two claims together, because the facts supporting them are centered on Defendants' actions in investigating the Wilson murder.

i. Reckless Investigation and False Evidence

Plaintiffs claim that Defendants "recklessly investigated the Wilson murder by ignoring exonerating evidence[] and accepting as true uncorroborated and contradictory inculpatory witness statements, as well as statements that were clearly refuted by easily verifiable facts of the murder." Plaintiffs also claim that Defendants coached witnesses to fabricate the necessary evidence required to support Defendants' theory of the case. The district court rejected both of these claims, finding "as a matter of law that there is not sufficient evidence to establish that . . . [Plaintiffs' convictions were] obtained through the knowing use of false evidence or conscience-shocking investigatory activities by the defendants."

We disagree with the district court's assessment of the evidence. Viewing the facts in the light most favorable to Plaintiffs, the evidence allows a reasonable

[5]The district court found that Plaintiffs raised other claims in their complaints, including claims based on unlawful arrest in violation of the Fourth Amendment, lack of counsel in violation of the Sixth Amendment, and coerced confession in violation of the Fifth and Fourteenth Amendments. The district court dismissed those claims as time-barred. Plaintiffs do not challenge this aspect of the district court's ruling on appeal.

inference that Defendants' investigation crossed the line from gross negligence to recklessness and that Defendants manufactured false evidence to complete their investigation.

To establish a constitutional violation based on an inadequate investigation, a plaintiff must show that the defendant officer's "failure to investigate was intentional or reckless, thereby shocking the conscience." Cooper v. Martin, 634 F.3d 477, 481 (8th Cir. 2011) (internal quotation marks omitted). "We have held that the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." Akins v. Epperly, 588 F.3d 1178, 1184 (8th Cir. 2009). Mere negligent failure to investigate, such as failing to follow up on additional leads, does not violate due process. See Amrine v. Brooks, 522 F.3d 823, 833-34 (8th Cir. 2008); Wilson, 260 F.3d at 955.

While a reckless investigation claim may be supported by proof that investigators exerted "systematic pressure to implicate the defendant in the face of contrary evidence," Akins, 588 F.3d at 1184, a manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant. See Whitlock v. Brueggemann, 682 F.3d 567, 585 (7th Cir. 2012) ("Significantly, all courts that have directly confronted the question before us agree that the deliberate manufacture of false evidence contravenes the Due Process Clause."); Devereaux v. Abbey, 263 F.3d 1070, 1076-77 (9th Cir. 2001) (en banc) ("Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another."). As in this case, a failure to investigate claim may be inextricably bound with a false evidence claim, where the Plaintiffs' theory is that investigators recognized deficiencies in a case and manufactured false evidence to fill those gaps.

Cf. Moran v. Clarke, 296 F.3d 638, 647-48 (8th Cir. 2002) (en banc) (denying qualified immunity where substantive due process claim was based on evidence that investigators "purposely ignored" exculpatory evidence, placed pressures on witnesses to incriminate a specific person, and manufactured evidence).

We find that Plaintiffs have presented sufficient evidence to allow the reasonable inference that Defendants recklessly investigated the Wilson murder and purposefully manufactured false evidence to implicate Plaintiffs. Specifically, there is evidence that suggests Defendants systematically coached witnesses into providing false testimony that was in line with the narrative of the Defendants' theory as to how the murder had been committed.

The circumstances under which Dean and Gonzalez were identified by witnesses provide the best example and raise the most serious concerns. First, Searcey reported Cliff Shelden listed Dean as a possible perpetrator, but there is no mention of Dean in any recorded portion of Shelden's interrogation. Searcey and Lamkin then interrogated Deb Shelden on successive days, April 13 and 14. In the interview held on April 13, Deb only named Taylor, Winslow, and White as being involved in the murder, and Deb stated that it was her own blood that was found at the scene of Wilson murder. When Deb's blood failed to be a correct match, Searcey and Lamkin interviewed Deb again on April 14. Deb then stated that Dean was also present during the Wilson murder and that she had been "blocking" her memory of his presence.

When Dean was arrested on April 15, 1989, he categorically denied any knowledge of Wilson's murder. While Dean was held in the county jail, Defendants subjected Dean to a number of interrogations outside the presence of counsel.[6] Smith,

_____

[6]Defendants argue that some of the evidence that Plaintiffs point to is their own "self-serving" deposition testimony circa 2010, such as Dean's deposition testimony

Searcey, Lamkin, and DeWitt each threatened Dean that he would be executed if he did not cooperate.

Additionally, Price pretended to act as Dean's counselor and told Dean that his polygraph results evidenced Dean repressing his own memory of being involved. After weeks of being told that he was present at the Wilson murder, Dean began to provide statements that he was indeed involved in the murder based on dreams he began to have. These dreams occurred after Defendants gave Dean certain facts, photos, and videos of the crime scene. The evidence suggests that Defendants engaged in weeks of indoctrination, eventually overcoming Dean's judgment and convincing him that he was indeed present at the scene of the crime.

Even after Defendants had arrested Taylor, Winslow, White, Dean, and Deb Shelden, an evidentiary deficiency remained: none of these suspects had type B blood to match the blood found at the scene of the Wilson murder. At this juncture, Searcey and Lamkin returned to one of the more malleable witnesses, Deb Shelden. Although Deb (and no other witness) had ever previously mentioned Gonzalez as a suspect before, Searcey showed a single photograph of Gonzalez to Deb when she recalled seeing someone else at the scene of the crime. The same day that Deb suddenly remembered that Gonzalez was present, Dean had a similar epiphany. A reasonable inference is that Gonzalez's identification was not a coincidence; instead,

_____

that he was interrogated outside the presence of counsel. Defendants point out that there is no such evidence from the records in the late 1980s. Although Plaintiffs' deposition testimony from 2010 could "perhaps be characterized as self-serving, . . . [it is] plausible, unchallenged and not circumstantially rebutted." See Thomas v. Runyon, 108 F.3d 957, 961 (8th Cir. 1997). In order to undercut this evidence, Defendants would have to go beyond the possible self-interest of the witness to develop inconsistences with the testimony or establish clear issues of credibility. See id. Defendants have not sufficiently done so.

a reasonable factfinder could find that Defendants coached or coerced Deb and Dean to implicate Gonzalez.

From this evidence, a factfinder could determine, as did the district court, that this was an aggressive but imperfect investigation where the officers had some basis to believe that Plaintiffs were guilty and, at most, the officers were negligent in putting together the evidence to inculpate Plaintiffs. But a factfinder could also determine that this was a reckless investigation where members of the sheriff's department forced vulnerable individuals into agreeing that they had a role in the Wilson murder and then coached those individuals into giving false testimony that fit into the sheriff department's own narrative of events while ignoring evidence contrary, and potentially fatal, to the department's theory.

Defendants may not be held liable merely for aggressively investigating the crime, believing witnesses, following leads, and discounting those pieces of evidence that do not fit with the evidence at the scene of the crime. In investigating a crime, it is unlikely that every witness's account will align perfectly with the testimony of every other witness. See Brady v. Dill, 187 F.3d 104, 113 (1st Cir. 1999) ("[W]e live in an age . . . where clerical errors in recording, receiving, or transmitting data are commonplace, and where descriptive inaccuracies can occur easily." (internal citations omitted)). However, Defendants may be held liable if they recklessly ignored evidence suggesting the Plaintiffs' innocence or systematically pressured witnesses to manufacture false testimony to fill gaps in an investigation. See Akins, 588 F.3d at 1184.

In its analysis, the district court found Winslow's claim to be "particularly weak," because "[t]he evidence against Winslow was strong and included two especially damning actions by Winslow himself. That is, Winslow admitted that he lied about his whereabouts on the night of the murder and he voluntarily made admissions during a use-immunity interview . . . wherein he implicated himself,

White, and Taylor." We agree with the district court's assessment that Defendants cannot be held liable for focusing on individuals like Taylor and Winslow as suspects. At the same time, however, there is evidence that suggests Searcey, DeWitt, and Lamkin coached witnesses to supply false evidence about Taylor and Winslow in order to strengthen the legal case against them. Therefore, that Taylor and Winslow admitted to being at the scene of the Wilson murder does not bar them from claiming that after they sought to recant their confessions, Defendants began a campaign to manufacture evidence to implicate them. Cf. Moran, 296 F.3d at 647 ("Instead of simply allowing a weakly supported prosecution to proceed, . . . the evidence can be read to show acts designed to falsely formulate a pretense of probable cause."); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) ("To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice.").

We next assess whether the evidence sufficiently shows that Defendants possessed a culpable state of mind during their investigation. The Defendants "conducting the post-arrest investigation certainly had the luxury of unhurried judgments and repeated reflections, which make a reckless standard appropriate" in evaluating the course of investigation. See Wilson, 260 F.3d at 957. As the Supreme Court has recognized, "the term recklessness is not self-defining." Farmer v. Brennan, 511 U.S. 825, 836 (1994). However, in Wilson, we noted that such a standard "normally contains a subjective component similar to criminal recklessness." 260 F.3d at 956 n.9. "The criminal law . . . generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." Farmer, 511 U.S. at 836-37.

There is sufficient evidence to support a finding that Defendants' actions during at least the latter part of their investigation were reckless. As explained in the foregoing discussion, Defendants had multiple opportunities to see that the evidence

-26-

they were assembling did not support their theory of the case. Defendants did in fact recognize that certain testimony and details, most prominently the lack of a suspect with matching B-type blood, caused serious problems for their case. But rather than allowing the discrepancies in the evidence to serve as red flags, Defendants instead pressed ahead and continued to exert pressure on vulnerable witnesses to provide testimony that was not within those witnesses' personal memory.

ii. Deprivation of Liberty

To prove a violation of their Fourteenth Amendment rights, Plaintiffs must also show that Defendants' reckless investigation deprived Plaintiffs of their liberty. See Whitlock, 682 F.3d at 582 ("[A] violation of the Fourteenth Amendment does not occur unless a person is 'deprive[d] . . . of life, liberty, or property, without due process of law.'" (quoting U.S. Const. amend. XIV, § 1)). False evidence or evidence derived from a reckless investigation only violates a criminal defendants' due process rights if it is "used to deprive the defendant of her liberty in some way." See id. at 580. Indeed, "if an officer . . . fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." Id. at 582; see also Zahrey v. Coffey, 221 F.3d 342, 348 (2d Cir. 2000).

In the instant case, Plaintiffs each entered pleas of guilty, nolo contendere, or no contest rather than proceeding to trial. Although the transcripts of three of the Plaintiffs' plea hearings are not in the record, there is evidence that the false evidence collected as a result of Defendants' investigation was used in those proceedings. Specifically, journal entries from the plea hearings of Taylor, Winslow, and Gonzalez indicate that County Attorney Smith outlined the facts that he expected to prove at trial. The transcript from Dean's plea hearing demonstrates that the facts supporting Dean's plea were derived from the false confessions made by Deb Shelden and Dean. A reasonable inference from the evidence is that the evidence presented at the plea

-27-

hearings of Taylor, Winslow, and Gonzalez was substantially similar to that presented at Dean's plea hearing. "Without the [reckless investigation or] fabrication, the prosecuting attorney would have had no tainted evidence to introduce" at the plea hearing. See Whitlock, 682 F.3d at 583. Therefore, because there is evidence Defendants used false evidence to secure a conviction, Plaintiffs have sufficiently supported a cognizable due process claim. See Wilson, 260 F.3d at 954-55 (allowing reckless investigation claim to proceed where evidence derived from investigation was used at plea hearing).

The district court found that regardless of the evidence that was presented at Plaintiffs' plea hearings, Plaintiffs' claims failed because there was no evidence they asserted their innocence at the plea hearings. As a result, the court reasoned that "as a matter of law . . . they cannot claim the defendants violated their right to due process by knowingly using false evidence to secure their convictions." The court based this reasoning on language from previous court decisions that state that "due process . . . does not impose a constitutional duty on state trial judges to ascertain a factual basis before accepting a plea of guilty or nolo contendere that is not accompanied by a claim of innocence." See Wallace v. Turner, 695 F.2d 545, 548 (11th Cir. 1983).

The district court's reliance on Wallace and similar cases is misplaced because the due process issue addressed in those cases is distinct from the due process issue now before us. Unlike the cases cited by the district court, Plaintiffs are not claiming that their rights were violated when the state court failed to determine whether there was sufficient evidence of their guilt. See, e.g., Orman v. Cain, 228 F.3d 616, 621 (5th Cir. 2000) ("Where the defendant proclaims his innocence but pleas guilty anyway, due process is satisfied only if the state can demonstrate a 'factual basis for the plea.'" (quoting North Carolina v. Alford, 400 U.S. 25, 38 & n.10 (1970))). Instead, Plaintiffs assert that their substantive due process rights were violated when Defendants conducted a conscience-shocking reckless investigation and amassed

-28-

false evidence that was used to box Plaintiffs into entering guilty pleas.  See Wilson, 260 F.3d at 954-55 (affirming that district court's finding that the right against the use of false evidence applied where the false statement was used at Wilson's probable cause and Alford plea hearings rather than at a trial).

### iii.  Shocks the Conscience

We next determine whether the constitutional violations in this case were so egregious so as to shock the conscience.  "Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise."  Strutton v. Meade, 668 F.3d 549, 557 (8th Cir.), petition for cert. filed, 80 U.S.L.W. 3670 (U.S. May 2, 2012) (No. 11-1329).  "Substantive due process 'is concerned with violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power . . . .'"  Golden ex rel. Balch v. Anders, 324 F.3d 650, 652-53 (8th Cir. 2003) (alterations in original).

We find that, if the factfinder draws the reasonable inferences outlined in the previous discussion, the facts of this case shock the conscience.  There is evidence that Defendants coerced and threatened Taylor, Dean, and Gonzalez to provide false testimony; purposefully ignored the fact that no witness could independently provide testimony about details of the crime; and exerted undue pressure to implicate Plaintiffs or to improperly strengthen the state's case against Plaintiffs.  Cf. Akins, 588 F.3d at 1184 (finding investigation was not conscience-shocking when investigators did not participate in these sort of actions).

Such actions severely undermine an individual's right to a fair criminal proceeding.  "Law enforcement officers . . . have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly. . . ."  Wilson, 260

-29-

F.3d at 957. "There is no countervailing equally important government interest that would excuse [officers] from fulfilling their responsibility" to conduct a fair investigation. Id. Accordingly, we find Plaintiffs have pointed to sufficient evidence to support their claims based on a conscience-shocking, reckless investigation and manufactured false evidence.

### iv. Coercing Guilty Plea

Plaintiffs also claim that the Defendants coerced their guilty pleas. "To prove that his plea was not a knowing and voluntary plea, [a criminal defendant] must show that he did not make 'a voluntary and intelligent choice among the alternative courses of action.'" Weisberg v. Minnesota, 29 F.3d 1271, 1278 (8th Cir. 1994). We agree with the district court that the evidence does not support Plaintiffs' coerced guilty plea claims.

As our Court recently recognized in Hayden v. Nevada County, 664 F.3d 770, 772 (8th Cir. 2012), we are unaware of any case in which section 1983 liability has been imposed for "coercing or inducing a guilty plea." A guilty plea is not rendered involuntary merely because an officer informs a defendant of the possible alternatives to pleading guilty, including facing the death penalty. See id. at 773 (holding guilty plea not rendered involuntary when sheriff told defendant "that pleading guilty 'would result in only two years of probation, with no fines or further holding'"); Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978) (stating that presenting a defendant with "the unpleasant alternatives of forgoing trial or facing charges in which [the defendant] was plainly subject to prosecution" does not violate due process).

We note that the Supreme Court has also left open the possibility that there may be a circumstance where a coerced confession or reckless investigation unconstitutionally taints a guilty plea. See Chambers v. Florida, 309 U.S. 227 (1940)

(reversing murder convictions of four defendants, three of whom pled guilty, when evidence showed their confessions were coerced). Commenting on Chambers, the Supreme Court has stated that there may be a circumstance where a coerced confession has an "abiding impact" that "also taint[s] the plea." See McMann v. Richardson, 397 U.S. 759, 767 (1970). In Chambers, guilty pleas were taken from two petitioners only two days after their confessions were secured. While Chambers was tried a month later, he and his fellow petitioners were "purportedly informed . . . they would be killed if they did not stick to their prior confessions." Cochran v. Norvell, 446 F.2d 61, 65 (6th Cir. 1971). "[F]rom arrest until sentenced to death, petitioners were never—either in jail or in court—wholly removed from the constant observation, influence, custody and control of those whose persistent pressure brought about the sunrise confessions." Chambers, 309 U.S. at 235.

This is not such a case. Here, each Plaintiff had at least a month from the time that he or she was arrested to the time that he or she eventually pled guilty.[7] There is no evidence they were denied provisions or that they were subjected to harsh living conditions. Furthermore, Plaintiffs were each represented by counsel during the bulk of the time that passed between their arrest and eventual guilty plea. See United States ex rel. Condon v. Erickson, 459 F.2d 663, 665 (8th Cir. 1972) (finding any taint was sufficiently dissipated where defendant was afforded advice of counsel for four-month period between incriminating statements and change of plea). Thus, while Plaintiffs opted to enter guilty pleas based on the false evidence that had been assembled against them, there is no evidence that they "did not understand the nature of the plea proceeding or that [they] entered [their] pleas involuntarily." See United States v. Vest, 125 F.3d 676, 679 (8th Cir. 1997). We agree with the district court

---

[7]Taylor was booked on March 17, 1989, but did not enter a guilty plea until September 1. Winslow was booked on March 17, but did not enter his no contest plea until December 8. Gonzalez was booked on May 26, but she did not enter her plea of nolo contendere until October 5. Dean's case is the closest, as he was arrested on April 15 and entered his guilty plea on May 17.

that the evidence is inadequate to show that their guilty pleas were not voluntary or knowing.

Accordingly, we affirm the district court's decision to grant immunity to Defendants against Plaintiffs' coerced guilty plea claims.

## B. Clearly Established

The next step in our analysis is to determine whether an individual's right to be free from a reckless investigation or from the use of false evidence to secure a conviction was clearly established in 1989. See Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012) ("When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident.").

"A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Mathers v. Wright, 636 F.3d 396, 399 (8th Cir. 2011) (quotation omitted). "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." Shekleton, 677 F.3d at 367 (internal alteration marks omitted). "[T]he unlawfulness must merely be apparent in light of preexisting law, and officials can still be on notice that their conduct violates established law even in novel factual circumstances." Nelson v. Corr. Med. Servs., 583 F.3d 522, 531 (8th Cir. 2009) (en banc) (internal citation and quotation marks omitted).

Defendants do not dispute that the right to be free from the use of false evidence to secure a conviction was clearly established in 1989, nor could they. See Napue v. Illinois, 360 U.S. 264, 269 (1959) (holding use of false evidence violates

-32-

due process). Instead, the parties dispute whether reasonable officers in 1989 should have known that recklessly investigating a crime violated clearly established law. We have previously addressed this issue in Wilson v. Lawrence County, 260 F.3d 946 (8th Cir. 2001).

In Wilson, the plaintiff brought a section 1983 civil rights action against law enforcement officials for their conduct in a murder investigation which led to his wrongful conviction. We affirmed the district court's denial of qualified immunity to the defendants, recognizing that "the liberty interest involved . . . is the interest in obtaining fair criminal proceedings." Wilson, 260 F.3d at 956 n.8. In Wilson, we noted such a right had previously been recognized in Brady v. Maryland, 373 U.S. 83, 87 (1963), where suppression of exculpatory evidence violated due process, and Napue v. Illinois, 360 U.S. at 269, where use of false evidence at trial violated due process. Wilson, 260 F.3d at 956 n.8. As a result, "[l]aw enforcement officers, like prosecutors, have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly." Id. at 957.

Here, the district court held that the right to be free from a reckless investigation was not clearly established in 1989. In reaching this result, the district court interpreted Wilson as not deciding whether a right to be free from reckless investigatory police work was clearly established in 1986 because the appellants "[did] not challenge the district court conclusion that the right was clearly established at the time of the alleged violation."

The district court is correct that in Wilson the appellants conceded that "intentional acts of failing to investigate other leads would violate due process." Wilson, 260 F.3d at 955. However, the appellants still argued that "allegations or evidence of recklessness [were] insufficient to state a claim." Id. We rejected their argument and held that the plaintiff's claim based on a reckless investigation in 1986 was actionable. Id. at 957. Pursuant to Wilson, then, a due process right against a

-33-

reckless investigation was clearly established in 1986. As a result, Plaintiffs' right to be free from a reckless investigation was clearly established three years later in 1989.

## III. Absolute Immunity

Plaintiffs contend the district court erred in concluding that Smith was entitled to absolute immunity.

> Prosecutors are entitled to absolute immunity from civil liability under § 1983 when they are engaged in prosecutorial functions that are intimately associated with the judicial process. Actions connected with initiation of prosecution, even if those actions are patently improper are immunized. However, purely administrative or investigative actions that do not relate to the initiation of a prosecution do not qualify for absolute immunity. The question of whether absolute or qualified immunity applies depends on whether the prosecutor's acts were prosecutorial, investigatory or administrative in nature.

Schenk v. Chavis, 461 F.3d 1043, 1046 (8th Cir. 2006) (internal citations, quotation marks, and alternation marks omitted). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns v. Reed, 500 U.S. 478, 486 (1991).

We find that the district court did not err in granting Smith absolute immunity. Although there is evidence Smith consulted with DeWitt about the investigation, there is no evidence that any action taken by Smith prior to the filing of criminal complaints against Plaintiffs was unconstitutional. And once the charging documents were filed, Smith was protected by absolute immunity. See Kalina v. Fletcher, 522 U.S. 118, 129 (1997) ("[The prosecutor's] activities in connection with the preparation and filing of two of the three charging documents—the information and the motion for an arrest warrant—are protected by absolute immunity."); see also

Brodnicki v. City of Omaha, 75 F.3d 1261, 1267-68 (8th Cir. 1996) (holding interviews taken at direction of prosecuting attorney "were conducted during the pendency of a proceeding to revoke [defendant's] release on bond" and thus were done as part of "carrying out [prosecutor's[ responsibilities as advocate for the state").

## IV. Evidentiary Rulings

Plaintiffs challenge several evidentiary rulings made as part of the summary judgment proceedings. Because we are reversing the grant of summary judgment as to Searcey, Lamkin, and DeWitt and the evidentiary rulings would not impact our holding as to Smith, Plaintiffs' challenge to evidentiary rulings is now moot.

## V. Conclusion

Based on the foregoing analysis, we find that Plaintiffs have pointed to sufficient evidence to allow their Fourteenth Amendment claims based on reckless investigation and manufactured false evidence to proceed.

In addition to bringing claims against Defendants in their individual capacities, Plaintiffs also asserted their section 1983 claims against Gage County and Defendants in their official capacities. The district court dismissed these claims based on its finding that the claims against the individual Defendants failed as a matter of law. See Cooper v. Martin, 634 F.3d 477, 481-82 (8th Cir. 2011) ("[I]n order for municipal liability to attach, individual liability must first be found on an underlying substantive claim." (internal quotation marks omitted)). Because we find that Plaintiffs have presented sufficient evidence to support their reckless investigation and manufactured evidence claims, the district court's rationale for dismissing the municipal liability claims is no longer supported. Therefore, the parallel claims against Gage County and Defendants in their official capacities must also be reinstated on remand.

-35-

We reverse the district court's decision to grant qualified immunity to Searcey, Lamkin, DeWitt, and Price as to Plaintiffs' claims based on reckless investigation and manufacturing of evidence. We reinstate the claims against Gage County and the Defendants in their official capacities. We affirm the district court as to its ruling that there was insufficient evidence to show that Plaintiffs' guilty pleas were unconstitutionally coerced. We likewise affirm the district court in its decision to grant Smith absolute immunity. The case is remanded for further proceedings in accordance with this opinion.

_____