# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2029

_____

| | | |
|---|---|---|
| Dennis W. Strutton, | * | |
| | * | |
| Plaintiff–Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Linda Meade, Psych I; Mary Weiler, | * | |
| LCSW; Jonathan Rosenboom, Sr., Psy.; | * | |
| Rebecca Semar, Act. III, Rec. Ther.; | * | |
| Alan Blake; Missouri Department of | * | |
| Mental Health, | * | |
| | * | |
| Defendants–Appellees. | * | |

_____

Submitted: February 24, 2011
Filed: February 3, 2012

_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Dennis W. Strutton filed a pro se 42 U.S.C. § 1983 action, alleging violations of his Fourteenth Amendment due process rights as a civilly-committed resident of

the Missouri Sexual Offender Treatment Center (MSOTC).[1] He now appeals the district court's[2] adverse judgment entered after a six-day bench trial. We affirm.

## I.

In 1999, Missouri lawmakers passed the Missouri Sexually Violent Predators Act (MSVPA). Under the MSVPA, those persons who are determined to be a "sexually violent predator"[3] are "committed to the custody of the director of the department of mental health for control, care and treatment until such time as the person's mental abnormality has so changed that the person is safe to be at large." Mo. Rev. Stat. § 632.495(2). MSOTC conducts annual mental health evaluations of each resident. Those evaluations are presented to the committing court to aid that court in determining whether a given resident should remain committed. The director of the Missouri Department of Mental Health or his designee may endorse a petition for release, but a court or jury ultimately determines whether a person has met the statutory requirements for release. See Mo. Rev. Stat. § 632.498.

MSOTC conducts a treatment program for its residents. Residents are not required to participate in the treatment program, but MSOTC encourages

---

[1]MSOTC has been renamed the Sexual Offender Rehabilitation Treatment Service and is now affiliated with the Southeast Missouri Mental Health Center. For clarity's sake, this opinion will continue to refer to the center as MSOTC.

[2]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

[3]"Sexually violent predator" is defined as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility and who: (a) Has pled guilty or been found guilty, or been found not guilty by reason of mental disease or defect . . . , of a sexually violent offense; or (b) Has been committed as a criminal sexual psychopath . . . ." Mo. Rev. Stat. § 632.480(5).

participation. The program consists of four phases, with progress levels within each phase. Phase I is "Engagement" and focuses on engaging the resident in the treatment process with an emphasis on understanding the cognitive behavioral process and the ability of the individual to change thoughts, feelings, and behavior. During Phase II, or "Cognitive Restructuring," the resident works to understand his "offense cycle" and begins to change the thought processes and thinking errors that lead to problem activities. At Phase III, called "Personal Deviant Cycles/Relapse Prevention/Emotional Integration," the individual is fully engaged in the treatment process and is working to establish healthier habits that avoid deviant thought processes and behaviors. The final phase is "Community Re-Integration." During Phase IV, the individual develops the necessary skills and techniques for living in the community at large.

To progress through the four phases, residents are required to participate in psychotherapeutic "process groups," which consist of group discussions led by psychologists and social workers. In the process groups, residents are expected to acknowledge their problems, identify their offense cycles, and learn how to break those cycles. According to defendant Alan Blake, the Chief Operating Officer of the MSOTC, it is impossible for a resident to complete sex offender treatment at the MSOTC without admitting to the crime or crimes that led to the resident's commitment. The therapists leading the process groups work to establish a therapeutic alliance, or rapport, with the members of the groups because the members frequently deny having committed sexual offenses and have difficulty speaking about their offenses. In addition to process groups, MSOTC also offers a variety of psychoeducational classes designed to help the residents learn more about behavior and anger management strategies or addiction behaviors. Participation in these classes is encouraged but not required for a resident to progress through the treatment program.

Budget limitations and staffing shortages have been continuing problems for the MSOTC. Significant shortages in professional staff occurred from the fall of 2006 through the spring of 2007. At that time, the defendants in this action—Blake; Rebecca Semar, former Clinical Director and acting Activity Therapy Coordinator; Mary Weiler, a Clinical Social Worker; Jonathan Rosenboom, the Clinical Director; and Linda Meade, a Psychologist—were tasked with the responsibility of responding to the struggles faced by MSOTC. The defendants implemented a series of changes to their psychoeducational courses and process group sessions. Psychoeducational courses were discontinued altogether during this time. On September 28, 2006, MSOTC sent a memorandum to the residents explaining that process groups would be doubling up on group therapists, increasing the size of the groups to the maximum, and placing some residents on a waiting list for future openings in the groups. The change to include co-therapists in each group was implemented so that in the event that a therapist was absent, the group could still be conducted. However, this also resulted in a reduction in the overall number of available groups. Also, the frequency of process group sessions was reduced from three times per week to twice a week, and the three trimester breaks when process groups were not conducted were increased from two weeks in length to four weeks.

For treatment and security purposes, MSOTC officials incorporated a set of rules, the violation of which resulted in a reduction of the resident's progress level and restriction of the resident's movement to a "Restriction Table." A resident assigned to the Restriction Table, which was located near the nurses' station, was not permitted to speak to another person unless that person was also seated at the table, and was only allowed to leave the table for meals, classes, process groups, and for an hour of exercise. Residents would remain at the table from early morning until late evening. Despite its name, residents assigned to the Restriction Table were not physically restrained and were allowed to stand, stretch, get a drink of water, or use the restroom as needed. Violations were categorized as minor, major, and intolerable. A resident who committed a "minor" violation received a two-day assignment to the Restriction

Table, "major" violations resulted in a seven-day assignment, and "intolerable" violations yielded a fourteen-day assignment. Assigned days at the Restriction Table could also accumulate, so some residents were subjected to months of time at the Restriction Table due to multiple rule violations. Additionally, residents who committed violations, and thus were assigned to the Restriction Table, were reverted to earlier treatment phases or progress levels within a given treatment phase.

Sometime after August 2007, use of the Restriction Table was discontinued, and MSOTC implemented the use of a Restriction Area. This Area was usually the facility's day hall where residents could be closely monitored by MSOTC staff. In addition to adopting the use of the Restriction Area, MSOTC no longer tied a resident's progress through treatment phases to a violation of the institution's rules.

II.

In 1997, Strutton pled guilty to first degree child molestation in Missouri state court. As part of his plea, he stipulated to being a "sexually violent predator" as defined by the MSVPA. After serving his term of imprisonment, Strutton was involuntarily committed in 2002 for an indefinite period of time to the MSOTC. When he first arrived at the MSOTC, Strutton rarely attended treatment classes, submitted multiple grievances about the classes he was asked to take and treatment he received, and was disruptive towards fellow residents and the nursing staff. While attending one progress group, Strutton was so disruptive that other members of the group threatened to quit.

In January 2006, Strutton joined a Phase I, or "Engagement," process group led by Deanna Wolf, a psychological resident who worked at MSOTC from September 2004 through September 2006. Wolf testified that prior to joining her group, Strutton had refused treatment for the majority of his time at the MSOTC. She noted that in June 2006, Strutton's participation with the group varied based on his mood, but that

by July, she felt that she was building some trust with him. According to a September 25, 2006 progress note, Wolf recorded, "Group started pulling back together. Mr. Strutton increased participation during groups and began being more receptive to feedback as well as providing feedback to peers. At times engaged in impression management." Wolf quit working at MSOTC after September 2006.

Strutton also testified about his treatment, recounting how he was transferred in late 2006 to a different process group led by a different staff member. After this transfer, he ultimately quit attending the process group because of purported conflicts with his family and because of conflicts he had with the new group leader, Marisa Richardson. In his testimony, Strutton staunchly maintained that he would not participate in any treatment that required him to admit past sexual offenses. He filed at least two habeas corpus petitions in federal court seeking release on the basis of actual innocence. He also testified that he often refused to attend process groups because of his Wiccan religious beliefs, but he acknowledged that nothing in those beliefs would prevent him from admitting past sexual offenses. Records from the MSOTC admitted into evidence before the district court demonstrate that Strutton was given multiple opportunities to attend process groups after he was transferred away from Wolf's process group in 2006. These records also show that Strutton only sporadically attended. When he did attend, he was not progressing in treatment and frequently was disruptive in the group.

### III.

Strutton initiated this lawsuit claiming, as relevant, that his Fourteenth Amendment substantive due process rights were violated by defendants' failure to provide him with consistent access to adequate mental health treatment and by the MSOTC's use of disciplinary measures that serve no therapeutic purpose. Strutton sought declaratory relief finding the challenged practices were unconstitutional and equitable relief requiring defendants to provide uninterrupted access to an adequate

treatment program and to cease use of the Restriction Table or Restriction Area as a means of disciplinary measures. During the pendency of the case, Strutton also sought sanctions against defendants for their failure to preserve emails and other records after he began this action.

After hearing six days of testimony and considering numerous exhibits, the district court issued a thorough opinion recounting in detail the testimony and evidence presented at trial. As relevant to the issues in this appeal, the district court first determined that Strutton had standing to pursue his claims and that the issues were not moot. Next, the district court held that Strutton did not have a fundamental right to treatment while committed to the MSOTC. The district court explained that any right to treatment possessed by Strutton arose under Missouri statute and that to establish a Fourteenth Amendment claim, Strutton had to show that the inadequacies in the treatment he received were so arbitrary or egregious as to shock the conscience. Although the district court determined that the temporary elimination of psychoeducational courses and the limitations imposed on process groups fell below an acceptable professional standard, the court also held that treatment made available to Strutton was not conscience-shockingly deficient. Finally, the district court held that "Strutton's allegations concerning the Restriction Table d[id] not implicate [a fundamental right] and its corresponding professional judgment standard" because Strutton was not physically restrained to the table. Nor did the court find the use of the Restriction Table to be conscience-shocking, due in large measure to Strutton's ability to stand, walk about, use the restroom, attend meals, and attend classes or process groups.

On appeal, Strutton claims that the district court erred when (1) it determined Strutton did not have a fundamental liberty interest in receiving treatment, (2) it applied a conscience-shocking standard to Strutton's claim of unconstitutional treatment, (3) assessed only the physical restraints imposed by the Restriction Table and Restriction Area and did not consider the impact of rules violations on Strutton's

progress in treatment, and (4) applied the conscience-shocking standard to Strutton's claims concerning the use of the Restriction Table and Restriction Area. Also, Strutton argues that the defendants failed to preserve documents and emails after he filed his lawsuit, and thus defendants destroyed important documents. Strutton claims this was done in bad faith and resulted in prejudice to him, and thus the district court improperly denied his motion for sanctions. Defendants challenge the district court's holding as to the issues of standing and mootness.

A.

In its responsive brief, the government defendants argue that the district court and this court lack jurisdiction to consider whether the treatment program or the use of the Restriction Table or Restriction Area violated Strutton's constitutional rights because Strutton lacks standing to bring this suit and because the issues are moot. These jurisdictional challenges must be considered as a threshold question, even though the defendants failed to file a cross-appeal on the issue. Constitution Party of S.D. v. Nelson, 639 F.3d 417, 420 (8th Cir. 2011).

"Article III establishes three elements as a constitutional minimum for a party to have standing: (1) 'an injury in fact,' meaning 'the actual or imminent invasion of a concrete and particularized legal interest'; (2) a causal connection between the alleged injury and the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision of the court." Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 985-86 (8th Cir. 2011) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990)).

-8-

Here, defendants contend that Strutton has failed to satisfy the causation element, arguing that Strutton's lack of progression was due to his own unwillingness to admit his index offense rather than to the interruption of process groups and the cancellation of psychoeducational classes in 2006. As the district court found, however, there was considerable evidence presented concerning the difficulty of engaging sex offenders in treatment, with testimony that as many as 98% of offenders initially refuse to accept responsibility for their actions. Also, the testimony demonstrated that while admitting the index offense was a necessary component of completing treatment, initial stages of treatment, specifically during the engagement phase, did not require admission of the index offense. Further, as it pertains to Strutton, the evidence showed that he participated in a process group and that his participation ended when the MSOTC modified available treatment offerings in response to staffing challenges. Thus, we agree with the district court that Strutton demonstrated that his alleged injury of not advancing in treatment was not due solely to his own recalcitrance and could be due to the lack of adequate treatment resources. We also agree that this injury would be redressable if the court, in accordance with Strutton's requested relief, ordered defendants to provide Strutton with consistent access to appropriate treatment. See Spencer, 523 U.S. at 7.

Defendants also contend that the issue of whether disruptions in the treatment violated Strutton's constitutional rights is now moot. Mere voluntary cessation of a challenged action does not moot a case. Rather a case becomes moot "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (quoting United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968)). The burden of showing that the challenged conduct is unlikely to recur rests on the party asserting mootness. Id. Defendants here have not met that burden. Defendants assert the conditions giving rise to this action are not presently in place due to changes they made at MSOTC, and they assert that there is no evidence that the complained-of conditions will necessarily

happen again. They fail to show, however, that the conditions "could not reasonably be expected to recur" in the event of future budgetary and staffing restrictions. Id. Accordingly, we agree with the district court that this issue is not moot.

We similarly reject defendants' standing and mootness arguments pertaining to MSOTC's use of the Restriction Table. Strutton asserted—and there was evidence presented at trial to support his claim—that MSOTC's use of the Restriction Table was "clinically defeating," and the mere transition to a Restriction Area would not alleviate the concerns expressed by experts concerning the use of this disciplinary tactic. Moreover, the issue is not moot because Strutton remains confined at MSOTC and subject to both the MSOTC's evolving disciplinary measures and the related therapeutic impact of those decisions on his progress. Cf. Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (holding prisoner's claim for equitable and declaratory remedy was moot where prisoner was no longer subject to the challenged conditions).

B.

We next address whether the district court erred when it determined that Strutton did not suffer a Fourteenth Amendment violation based on the treatment he received and the use of the Restriction Table at MSOTC. As this is an appeal from a civil bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. See King v. United States, 553 F.3d 1156, 1160 (8th Cir. 2009). Strutton maintains that, as a matter of law, the district court should have applied the Youngberg "professional judgment" standard, as opposed to the "conscience-shocking" standard, in analyzing whether he was subjected to a due process violation. See Youngberg v. Romeo, 457 U.S. 307, 320-22 (1982).

In Youngberg, the Supreme Court addressed the question of whether Nicholas Romeo, a mentally handicapped man who had been involuntarily committed to a Pennsylvania state institution, had a constitutional right to treatment. Romeo was

committed to the Pennhurst State School and Hospital. At Pennhurst, Romeo suffered numerous injuries due to his own violence and the violence of others. For a period of time, he was routinely restrained physically for prolonged periods of each day. The Court held that under the Fourteenth Amendment, civilly committed individuals "enjoy constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." Id. at 324. The state is thus obligated to provide "such training as an appropriate professional would consider reasonable to ensure [the committed's] safety and to facilitate his ability to function free from bodily restraints." Id. The Supreme Court stressed that "decisions made by the appropriate professional are entitled to a presumption of correctness." Id.

The Court, however, did not address the question of whether an individual "committed for care and treatment under state law . . . has a state substantive right to habilitation, which is entitled to substantive . . . protection under the Due Process Clause of the Fourteenth Amendment." Id. at 316 n.19. Since Youngberg, some circuits have adopted a rule that "the Fourteenth Amendment Due Process Clause requires states to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured and released." Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir. 2000) (citing Ohlinger v. Watson, 652 F.2d 775, 778 (9th Cir. 1980)). We have not adopted such an approach. Instead we have held that although "the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." See Elizabeth M. v. Montenez, 458 F.3d 779, 788 (8th Cir. 2006); Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991) (holding that person who was civilly committed for purposes of safe-keeping did not have a constitutional right to psychiatric treatment for pedophilia), see also

-11-

Kansas v. Hendricks, 521 U.S. 346, 366 (1997) ("[W]e have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available.").

The district court was correct that Strutton does not have a fundamental due process right to sex offender treatment. Accordingly, Youngberg's "professional judgment" standard does not apply to this case. Strutton's due process claim originates from the state statutory mandate to provide for Strutton's confinement "for control, care and treatment until such time as [his] mental abnormality has so changed that [he] is safe to be at large." Mo. Rev. Stat. § 632.495(2). We remain cautious not to turn every alleged state law violation into a constitutional claim. Only in the rare situation when the state action is "truly egregious and extraordinary" will a substantive due process claim arise. See Chesterfield Dev. Corp. v. City of Chesterfield, 963 F.2d 1102, 1104-05 (8th Cir. 1992). This is why the district court properly analyzed Strutton's claims to determine whether the state action of eliminating the psychoeducational classes and modifying the process groups was so arbitrary or egregious as to shock the conscience. See United States v. Salerno, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty.'" (quoting Rochin v. California, 342 U.S. 165, 172 (1952) and Palko v. Connecticut, 302 U.S. 319, 325–326 (1937))).

Through the conscience-shocking prism, we reach the same result as the district court. Although the treatment Strutton received may have been less than ideal, and perhaps even inadequate by professional standards, it was not so lacking as to shock the conscience. After reviewing the considerable trial record developed by the district court, we can confidently agree with the lower court's finding that budget shortfalls and staffing shortages resulted in treatment modifications that were below the standards set in place by MSOTC's directors. However, the temporary modifications in the treatment regimen of eliminating psychoeducational classes and increasing the

size of process groups was neither arbitrary nor egregious. Rather, MSOTC sought to maintain essential treatment services in light of the challenges it faced. Perhaps different choices could have been made, but it would be improper for this court to review these decisions in hindsight, absent a determination that the decisions shock the conscience. Accordingly, we affirm the district court's determination that Strutton failed to prove his substantive due process claim.

We similarly reject Strutton's argument that MSOTC's use of the Restriction Table and later use of the Restriction Area violated Strutton's Fourteenth Amendment due process rights. The district court found that those residents assigned to the Restriction Table or Restriction Area retained "a comparatively free range of movement and activities" including the ability "to get up and stretch, to leave to attend group sessions and meetings, to converse with other residents, to work on homework or legal issues, and to play cards." Because Strutton was not physically restrained while he was assigned to the Restriction Table or Restriction Area, Youngberg's "professional judgment" standard is again inapplicable. Even in Youngberg, the Court recognized the difficulty of maintaining order and discipline among those who have been civilly detained. See Youngberg, 457 U.S. at 320. At trial, several witnesses testified about the need to regulate the behavior of the residents at MSOTC. According to Blake, the purpose of the Restriction Table was to place the offending resident in an environment where he could be closely observed by staff, reflect on his actions, and better learn to control impulsive behavior. Strutton's expert acknowledged that "reasonable clinical judgment" was used in implementing the Restriction Table, but suggested that it was not "particularly effective" in its application. Again, we find ourselves in agreement with the district court that nothing about MSOTC's use of the Restriction Table was so egregious as to shock the conscience, and therefore Strutton has failed to prove a substantive due process violation in the use of the Restriction Table or Restriction Area.

IV.

Finally, we address Strutton's appeal of the district court's denial of sanctions against defendants. The district court retains an inherent power to impose sanctions, and we review the use of that authority for abuse of discretion. Stevenson v. Union Pac. RR. Co., 354 F.3d 739, 745 (8th Cir. 2004). Strutton argues that upon his filing of this action, defendants were under an obligation to prevent the destruction of any evidence that could be related to the case and that defendants' failure to impose a litigation hold over agency e-mails warranted the imposition of sanctions. At the hearing on the motion for sanctions, the defendants explained that there was a consolidation of the information technology systems of multiple state agencies in 2006 and that e-mails were deleted in an effort to free up server space on the consolidated system. The district court noted that "[t]here's no doubt that after the notice of the lawsuit there was an intentional destruction [of agency e-mails], [though] not perhaps with a fraudulent intent as to this case." (Mot. Hr'g Tr. 26.) The district court determined that the "Defendants' failure to maintain and produce treatment records, including their failure to impose a litigation hold on facility e-mails after Mr. Strutton filed this suit, is very troubling" but did not find that sanctions were warranted. (Mem. Opinion, Doc. 248, pg. 24, n.7.) See Greyhound Lines, Inc. v. Wade, 485 F.3d 1032, 1035 (8th Cir. 2007) ("The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth[.]"). Accordingly, the decision to deny the imposition of sanctions was not an abuse of the considerable discretion given to the district court. See Menz v. New Holland N. Am., Inc., 440 F.3d 1002, 1005 (8th Cir. 2006) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." (quoting Plaintiffs' Baycol Steering Comm. v. Bayer Corp., 419 F.3d 794, 802 (8th Cir. 2005))).

## V.

Accordingly, we affirm the district court's finding in favor of defendants and its denial of plaintiff's motion for sanctions.

_____