# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3485

_____

Kevin Scott Karsjens; David Leroy Gamble; Kevin John DeVillion; Peter Gerard Lonergan; James Matthew Noyer, Sr.; James John Rud; James Allen Barber; Craig Allen Bolte; Dennis Richard Steiner; Kaine Joseph Braun; Christopher John Thuringer; Kenny S. Daywitt; Bradley Wayne Foster; Brian K. Hausfeld, and all others similarly situated

*Plaintiffs - Appellees*

v.

Emily Johnson Piper; Kevin Moser; Peter Puffer; Nancy Johnston; Jannine Hebert; Ann Zimmerman, in their official capacities

*Defendants - Appellants*

-------------------------------

Minnesota House of Representatives

*Amicus on Behalf of Appellant(s)*

Eric Steven Janus; American Civil Liberties Union of Minnesota

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: April 12, 2016
Filed: January 3, 2017
_____

Before MURPHY, COLLOTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Class plaintiffs, civilly committed sex offenders, bring a facial and as applied challenge under 42 U.S.C. § 1983, claiming their substantive due process rights have been violated by Minnesota's Civil Commitment and Treatment Act and by the actions and practices of the managers of the Minnesota Sex Offender Program (MSOP). The Minnesota state defendants in this action are managers of MSOP—Emily Johnson Piper, Commissioner of the Minnesota Department of Human Services; Kevin Moser, MSOP Facilities Director at Moose Lake; Peter Puffer, MSOP Clinical Director; Nancy Johnston, MSOP Executive Director; Jannine Herbert, MSOP Executive Clinical Director; and Ann Zimmerman, MSOP Security Director (collectively "state defendants"). After several months of litigation, including a six-week bench trial, the district court found for plaintiffs and entered an expansive injunctive order. The district court applied incorrect standards of scrutiny when considering plaintiffs' claims, thus we reverse the finding of substantive due process violations and vacate the injunctive relief order. We remand to the district court for further proceedings to address the remaining claims.

I.

A. Minnesota Statutory Structure

In 1994, the Minnesota legislature enacted the Minnesota Civil Commitment and Treatment Act: Sexually Dangerous Persons and Sexual Psychopathic

Personalities (MCTA). MCTA is now codified at Minnesota Statute § 253D. Under the MCTA, a county attorney in Minnesota may petition a state district court to civilly commit a sexually dangerous person[1] or a person with a sexual psychopathic personality[2] to a secure treatment facility. Minn. Stat. Ann. § 253D.07(1)-(2). If the county attorney demonstrates by clear and convincing evidence that a person is a sexually dangerous person or has a sexual psychopathic personality, "the court shall order commitment for an indeterminate period of time and the committed person shall be transferred, provisionally discharged, or discharged, only as provided in this chapter." Minn. Stat. Ann. § 253D(3)-(4). A person subject to commitment under MCTA is entitled to be represented by counsel, and if the person does not provide counsel for himself, the court appoints a qualified attorney to represent the person. Minn. Stat. Ann. § 253D.20.

Once committed under MCTA, a committed person or the executive director of the Minnesota Sex Offender Program may petition for a reduction in custody, which includes "transfer out of a secure treatment facility,[3] a provisional discharge,[4]

_____

[1]MCTA defines "sexually dangerous person" as "a person who: (1) has engaged in a course of harmful sexual conduct . . . ; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct . . . ." Minn. Stat. Ann. § 253D.02(16).

[2]MCTA defines "sexual psychopathic personality" as "the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons." Minn. Stat. Ann. § 253D.02(15).

[3]"The following factors must be considered in determining whether a transfer [out of a secure treatment facility] is appropriate: (1) the person's clinical progress and present treatment needs; (2) the need for security to accomplish continuing

or a discharge from commitment.[5]"  Minn. Stat. Ann. § 253D.27.  The petition is "filed with and considered by a panel of the special review board."  Id.  These panels consist of "members experienced in the field of mental illness," including at least one "psychiatrist or a doctoral level psychologist with forensic experience" and one attorney.  Minn. Stat. Ann. § 253B.18(4c).  The special review board must hold a hearing and "issue a report with written findings of fact and shall recommend denial or approval of the petition to the judicial appeal panel.[6]"  Minn. Stat. Ann. § 253D.27(3), (4).  An appeal of the recommendation of the special review board may be made by the committed person, the county attorney, or the commissioner of the Department of Human Services (DHS) to the judicial appeal panel.  Minn. Stat. Ann. § 253D.28.  At a hearing, the judicial appeal panel receives evidence and makes a de

---

treatment; (3) the need for continued institutionalization; (4) which facility can best meet the person's needs; and (5) whether transfer can be accomplished with a reasonable degree of safety for the public."  Minn. Stat. Ann. § 253D.29(1).

[4]"The following factors are to be considered in determining whether a provisional discharge shall be granted:  (1) whether the committed person's course of treatment and present mental status indicate there is no longer a need for treatment and supervision in the committed person's current treatment setting; and (2) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the committed person to adjust successfully to the community."  Minn. Stat. Ann. § 253D.30(1).

[5]"A person who is committed as a sexually dangerous person or a person with a sexual psychopathic personality shall not be discharged unless it appears to the satisfaction of the judicial appeal panel, after a hearing and recommendation by a majority of the special review board, that the committed person is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision."  Minn. Stat. Ann. § 253D.31.

[6]"The Supreme Court shall establish an appeal panel composed of three judges and four alternate judges appointed from among the acting judges of the state."  Minn. Stat. Ann. § 253B.19(1).

novo consideration of the recommendation of the special review board. <u>Id.</u> Appeals of the decision of the judicial appeal panel may be made to the Minnesota Court of Appeals. <u>Id.</u>; Minn. Stat. Ann. § 253B.19(5).

"A committed person may not petition the special review board any sooner than six months following either" the entry of the initial commitment order by the district court or appeal therefrom or resolution of a prior petition including exhaustion of any appeal rights. Minn. Stat. Ann. § 253D.27(2). The MSOP executive director may, however, petition for reduction in custody at any time. <u>Id.</u>

B.  Minnesota Sex Offender Program (MSOP)

The State of Minnesota established, under the vested authority of the Commissioner of DHS, the MSOP. Under law, MSOP is to "provide specialized sex offender assessment, diagnosis, care, treatment, supervision, and other services to civilly committed sex offenders . . . [which] may include specialized programs at secure treatment facilities . . . , consultative services, aftercare services, community-based services and programs, transition services, or other services consistent with the mission of the Department of Human Services." Minn. Stat. Ann. § 246B.02. MSOP maintains three main facilities to treat persons committed under MCTA. The largest facility is a secure facility located in Moose Lake, Minnesota, and it houses persons who are in the earliest stages of treatment. The second, secure facility is located in St. Peter, Minnesota, and it houses inmates who have progressed beyond the initial phase of treatment. A third facility known as Community Preparation Services (CPS) is located outside the secure perimeter in St. Peter. CPS is designed for persons in the final stages of treatment who are preparing for reintegration into the community.

Beginning in 2008, MSOP adopted a three-phase treatment program. Phase I focuses on rule compliance, emotional regulation, and treatment engagement, but

individuals do not receive any specific sex offense therapy. In Phase II, MSOP provides therapy that focuses on identifying and addressing patterns of sexually abusive behaviors. MSOP emphasizes discussion and exploration of the committed individual's history of sexually offensive behaviors along with the motivations of those behaviors. When a committed person reaches Phase III, MSOP builds on the skills learned in Phase II and focuses on reintegration into the community. Advancement through the phases is based on a Goal Matrix where the individual's treatment process is scored using various factors. Although the MSOP Treatment Manual states that a committed person could be initially assigned to any phase of the program, no MSOP official could recall a person being assigned to anything but Phase I at the Moose Lake facility.

The district court found that since its inception in 1994, MSOP has accepted approximately 714 committed individuals, but no committed individual has been fully discharged from MSOP and only three people have been provisionally discharged from the program. The committed individuals represent about 4% of Minnesota's registered sex offenders. Minnesota officials project that the number of civilly committed sex offenders will grow to 1,215 by 2022. Minnesota has the highest per-capita population of civilly committed sex offenders in the nation.

C. Claims

In December 2011, plaintiffs filed a pro se suit, pursuant to 42 U.S.C. § 1983, challenging the conditions of their confinement and certain MSOP policies and practices. The focus of the initial complaint concerned housing conditions, property possession, searches, visitation rights, disciplinary procedures, vendor choices, vocational training, and access to electronic devices. The complaint also claimed that MSOP did not provide constitutionally adequate treatment and thus violated plaintiffs' due process rights. After obtaining counsel in January 2012, plaintiffs filed a First Amended Complaint raising generally the same claims as in the original

complaint and seeking class certification. The district court granted class certification.

As litigation progressed, including discovery, the district court, in an effort to reach a settlement agreement, ordered the DHS commissioner to create a fifteen-member "Sex Offender Civil Commitment Advisory Task Force" to "examine and provide recommended legislative proposals to the Commissioner on the following topics:

A. The civil commitment and referral process for sex offenders;

B. Sex offender civil commitment options that are less restrictive than placement in a secure treatment facility; and

C. The standards and processes for the reduction in custody for civilly committed sex offenders."

The court later ordered the creation of a MSOP Program Evaluation Team to evaluate the class plaintiffs' treatment placement and phase progression.

In August 2013, plaintiffs moved for a declaratory judgment finding the MCTA unconstitutional on its face and as applied to plaintiffs. The plaintiffs argued that the statute is unconstitutional on its face because the statutory discharge standards are more difficult to overcome than the initial statutory commitment standards. For a person to be committed, the state has to show the person is a sexually dangerous person or a person with a sexual psychopathic personality and that the person is highly likely to reoffend. However, discharge under MCTA requires a showing that the person is "no longer dangerous." In comparison to the commitment criteria, the plaintiffs argued the discharge standard is more stringent. The plaintiffs also claimed the statute is unconstitutional as applied because no person committed has ever been fully discharged from MSOP and because there is no automatic, independent, periodic review of an individual's need for continuing commitment. In February 2014, the court denied plaintiffs' motion for declaratory judgment and issued detailed

instructions to the four Rule 706 experts it had appointed to assist the court in understanding the complexities of the case.[7]

D.  Bench Trial

The district court proposed hearing the matter in a bench trial.  The state defendants objected, arguing that they had preserved the right to a jury trial.  In response, plaintiffs moved to again amend their complaint to clarify their allegations and to remove any damages claim from the complaint.  The magistrate judge granted the motion to file the Third Amended Complaint that clearly set forth facial and as applied claims based on due process violations and removed any damages claim.  Because there were no longer damages claims and plaintiffs were only seeking injunctive relief, the district court ordered that the case be submitted at a bench trial.

Phase I of the bench trial occurred from February 9, 2015 to March 18, 2015.  During the six-week trial, the district court heard testimony from all four Rule 706 experts, several named plaintiffs, and MSOP employees and staff.  Following the trial, the district court entered a broad order finding MCTA unconstitutional facially and as applied.  The court held that Minnesota's civil commitment scheme for sex offenders is a punitive system without the safeguards found in the criminal justice system.  It also held that MCTA "is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment."  Specifically, the district court concluded:

> section 253D is facially unconstitutional for the following six reasons:
> (1) section 253D indisputably fails to require periodic risk assessments

---

[7]Federal Rules of Evidence permit district courts to appoint independent experts to assist the court understand complex and difficult issues.  Fed. R. Evid. 706 (court may "[o]n a party's motion or on its own" appoint an expert to serve on behalf of the court).

and, as a result, authorizes prolonged commitment even after committed individuals no longer pose a danger to the public and need further inpatient treatment and supervision for a sexual disorder; (2) section 253D contains no judicial bypass mechanism and, as such, there is no way for Plaintiffs to timely and reasonably access the judicial process outside of the statutory discharge process to challenge their ongoing commitment; (3) section 253D renders discharge from the MSOP more onerous than admission to it because the statutory discharge criteria is more stringent than the statutory commitment criteria; (4) section 253D authorizes the burden to petition for a reduction in custody to impermissibly shift from the state to committed individuals; (5) section 253D contemplates that less restrictive alternatives are available and requires that committed individuals show by clear and convincing evidence that a less restrictive alternative is appropriate, when there are no less restrictive alternatives available; and (6) section 253D does not require the state to take an affirmative action, such as petition for a reduction in custody, on behalf of individuals who no longer satisfy the criteria for continued commitment.

The district court also determined MCTA was unconstitutional as applied for six reasons:

(1) Defendants do not conduct periodic independent risk assessments or otherwise evaluate whether an individual continues to meet the initial commitment criteria or the discharge criteria if an individual does not file a petition; (2) those risk assessments that have been performed have not all been performed in a constitutional manner; (3) individuals have remained confined at the MSOP even though they have completed treatment or sufficiently reduced their risk; (4) discharge procedures are not working properly at the MSOP; (5) although section 253D expressly allows the referral of committed individuals to less restrictive alternatives, this is not occurring in practice because there are insufficient less restrictive alternatives available for transfer and no less restrictive alternatives available for initial commitment; and (6) although treatment has been made available, the treatment program's structure has

been an institutional failure and there is no meaningful relationship between the treatment program and an end to indefinite detention.

In reaching its conclusions as to both Counts 1 and 2, the facial and as-applied challenges, the district court applied "strict scrutiny, placing the burden on the state to show that the law is narrowly tailored to serve a compelling state interest" because "Plaintiffs' fundamental right to live free of physical restraint is constrained by the curtailment of their liberty." The court noted it would address the remaining claims in the Third Amended Complaint in a second phase of the trial and in a separate order.

E. Injunctive Relief

In a subsequent order, the district court directed MSOP to "conduct independent risk and phase placement reevaluation of all current patients at MSOP." The court provided detailed directions as to how and when the reviews were to be conducted, including identifying certain individuals to be evaluated first, and directed MSOP officials to file petitions for reduction in custody for all persons found eligible for such relief through the reevaluation. Defendants' compliance with the court's directives are to be monitored by a special master who has "authority to monitor compliance with the remedies" and "authority to implement and enforce the injunctive relief imposed by the Court and to mediate any dispute between the parties with regard to the implementation of the remedies." The order further noted that the court "contemplates" entering "further specific relief against Defendants" in subsequent orders, foreseeing directions as to MSOP's treatment structure and discharge process, training for MSOP employees, periodic evaluation of MSOP by external experts, and the development of a statewide public education campaign.

II.

The state defendants appeal the district court's entry of declaratory judgment and the district court's grant of injunctive relief. First, they allege structural due

process error based on the district judge's bias against them. Second, the state defendants argue three jurisdictional defects. Lastly, the state defendants dispute the district court's determinations on the merits, focusing specifically on whether the district court applied the proper standards of scrutiny to the plaintiffs' due process claims. All issues raised by the state defendants concern questions of law, which we review de novo. See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 134 S. Ct. 1744, 1748 (2014) (recognizing that questions of law are reviewed under de novo standard of review).

A. Judicial Bias

The state defendants claim that the district court pre-judged the case against them, violating their due process rights to a neutral decisionmaker. In support of this argument, state defendants first point to various comments made by the district court that are critical of MSOP and remarks suggesting that state officials should make drastic changes to the program. For instance, in one order, the district court concluded with the statement, "The program's systemic problems will only worsen as hundreds of additional detainees are driven into MSOP over the next few years. The politicians of this great State must now ask themselves if they will act to revise a system that is clearly broken, or stand idly by and do nothing, simply awaiting Court intervention." (Doc. 427 at 69 (footnote omitted).) Just prior to the bench trial, the court denied the state defendants' motion to dismiss the Third Amended Complaint and for summary judgment. In that order, it stated, again in conclusion, "It is difficult for the Court to understand why the parties have not resolved this case in a manner that would address clients' concerns, serve the public interest, promote public safety, and serve the interests of justice for all concerned. Justice requires no less." (Doc. 828 at 43.)

Second, the state defendants argue that the Rule 706 experts were improperly used by the court to aid the plaintiffs in preparing and presenting their case.

Although not appealing the court's appointment of the Rule 706 experts, the state defendants argue that the court used those experts to prosecute the plaintiffs' case and this demonstrates that the court had assumed the mantle of an advocate.

Third, the state defendants note that the Third Amended Complaint was filed almost three years after the commencement of the case and matched the court's September 9, 2014 order as to the issues the court wished to address in the bench trial. Again, the state defendants are not challenging the district court's order allowing the plaintiffs to file the Third Amended complaint; rather, the state defendants argue that it was improper for the court to counsel the plaintiffs on the claims it should present to the court. This Third Amended Complaint also had the effect of forcing a bench trial as the three previous versions of the complaint contained damages claims but the Third Amended Complaint only sought equitable relief.

Finally, the state defendants argue that the district court ordered the creation of a task force to provide legislative proposals for settlement purposes. The state defendants claim that the district court's order providing for the creation of the task force provided that the report prepared by the task force would not be admissible at trial, but the court admitted the report at the bench trial and then considered and relied upon the report in deciding the case. The state defendants also claim the district court influenced who would be appointed to that task force. This process, the state defendants claim, also demonstrates improper judicial advocacy.

The state defendants argue the result of these various district court actions was obviously biased fact-finding by the court. According to the state defendants, the court assumed the role of an advocate instead of a neutral magistrate. Based on this alleged bias, the state defendants request that this court overturn the decisions of the district court as the bias constitutes a structural error requiring "automatic reversal."

-12-

Parties to litigation are "entitled to due process, the essence of which is a fair trial before a tribunal free from bias or prejudice." Gardiner v. A.H. Robins Co., 747 F.2d 1180, 1191 (8th Cir. 1984) (citing In re Murchison, 349 U.S. 133, 136-37 (1955)). "Ordinarily, when unfair judicial procedures result in a denial of due process, this court could simply find error, reverse and remand the matter." Reserve Mining Co. v. Lord, 529 F.2d 181, 185 (8th Cir. 1976). In those cases where the court has found a biased or prejudiced district judge resulted in a due process violation, the evidence of bias was overwhelming. For instance, in Gardiner, the district judge "stated that he believed the truth of plaintiffs' allegations, adding that he had become an advocate for plaintiffs and that he was, in fact, prejudiced." 747 F.2d at 1192.

In this matter, the state defendants point to a handful of remarks made over the course of months of litigation. These comments do give some cause for concern; if they are not premature remarks on the merits of the litigation, then they could in some instances be construed as policy pronouncements that risk straying beyond the judicial role. We are not convinced, however, that the actions and statements complained of, individually or collectively, establish that the district court was biased. Instead, the decisions of the district court in appointing the Rule 706 experts, allowing for a late amendment to the complaint, and appointing the task force were arguably done in an effort to streamline the complicated case and attempt to reach an amicable settlement between the parties.[8] Further, unlike cases such as Gardiner, where one party was not allowed to present their case to the court, the district court did not prevent the state defendants from presenting their case to the district court in a six-week bench trial, and the district court gave due consideration to all arguments. In further proceedings, moreover, we are confident that the district court will be sensitive to avoiding even the appearance of bias or prejudgment of the merits.

---

[8]Neither the class plaintiffs nor the state defendants objected to the creation of the Task Force.

-13-

B. Jurisdiction

The state defendants raise three challenges to the jurisdiction of the district court in this matter. First, the state defendants argue the plaintiffs lacked standing to challenge MCTA. The state defendants argue the latest version of the complaint alleges violations of the plaintiffs' liberty interests, but the plaintiffs have not identified a named plaintiff or a member of the class who would be entitled to discharge if reevaluated. Instead, the plaintiffs merely speculate that some of them or some of the members of the class would be subject to discharge upon completion of a risk assessment. According to the state defendants, because the alleged harm is speculative, the plaintiffs have not shown an actual deprivation of their liberty, and thus they lack standing to bring this action.

We reject this argument. "Article III establishes three elements as a constitutional minimum for a party to have standing: (1) 'an injury in fact,' meaning 'the actual or imminent invasion of a concrete and particularized legal interest'; (2) a causal connection between the alleged injury and the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision of the court." Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 985-86 (8th Cir. 2011) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990)). Here, we agree with the class plaintiffs that they have standing because their claim is not that they are all entitled to release but rather that their constitutional rights are being violated because MCTA and MSOP's implementation of MCTA violates the due process clause. The class plaintiffs are seeking certain procedural protections such as periodic reviews of their confinement and placement in appropriate facilities. All plaintiffs are committed under MCTA and detained in MSOP. Thus, if their

-14-

allegations are true, the plaintiffs have suffered a concrete injury caused by the challenged action that could be redressed by appropriate injunctive relief.

Next, the state defendants argue that this action is barred under Heck v. Humphrey, 512 U.S. 477 (1994), and Preiser v. Rodriguez, 411 U.S. 475 (1973), because it is an attempt to use 42 U.S.C. § 1983 to challenge the fact or duration of their confinement and such claims can be brought only in a habeas petition under 28 U.S.C. § 2254. "[A] state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." Edwards v. Balisok, 520 U.S. 641, 643 (1997) (quoting Heck, 512 U.S. at 487). This action, however, would not necessarily imply the invalidity of any of the plaintiffs' commitment. See Huftile v. Miccio-Fonseca, 410 F.3d 1136, 1140 (9th Cir. 2005) (noting Heck applies to civilly committed persons as well as prisoners). They do not allege that their initial commitment was invalid. Nor is it alleged that any specific class members should be immediately released. Instead, the plaintiffs claim that they should receive relief including regular, periodic assessment reviews to determine if they continue to meet the standards for civil commitment. It is conceivable that upon receiving an assessment none of the plaintiffs would be eligible for release, despite the district court's finding otherwise. Because the injunctive relief sought would not necessarily imply the invalidity of the plaintiffs' commitment, this action is not barred under Heck or Preiser.

Finally, the state defendants challenge the subject matter jurisdiction of the federal courts under the Rooker-Feldman doctrine. The defendants claim plaintiffs are seeking through this action to reverse "hundreds" of state-court judgments that have held MCTA to be constitutional when raised by individual defendants challenging the application of MCTA to them. "The Rooker-Feldman doctrine is narrow; it applies only to 'cases brought by state-court losers complaining of injuries

-15-

caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" Edwards v. City of Jonesboro, 645 F.3d 1014, 1018 (8th Cir. 2011) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)). "The doctrine thus occupies a 'narrow ground' and does not 'stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court.'" Banks v. Slay, 789 F.3d 919, 922 (8th Cir. 2015) (quoting Exxon Mobil Corp., 544 U.S. at 284, 293). As previously discussed, the class plaintiffs are not seeking review and rejection of state court judgments nor are the plaintiffs claiming to have suffered harm because of prior state court judgments which have held MCTA constitutional. Through this action, plaintiffs are seeking prospective injunctive relief based on a theory that the MCTA violates their fundamental liberty rights. Therefore the narrow Rooker-Feldman bar does not apply to this action.

## C. Standards of Scrutiny

The district court held that, because the committed individuals have a fundamental right to liberty, strict scrutiny was the proper standard of scrutiny to apply to plaintiffs' facial and as-applied due process claims. The district court therefore determined MCTA had to be narrowly tailored to achieve a compelling governmental purpose and that it failed to meet this narrow tailoring both facially and as applied. We disagree with application of the strict scrutiny standard.

## i. Facial Due Process

The United States Constitution guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Supreme Court has not expressly identified the proper level of scrutiny to apply when reviewing constitutional challenges to civil commitment

-16-

statutes." United States v. Timms, 664 F.3d 436, 445 (4th Cir.), cert. denied, 133 S. Ct. 189 (2012). However, to date, the strict scrutiny standard applied by the district court is reserved for claims of infringements on "fundamental" liberty interests upon which the government may not infringe "unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993). According to the Supreme Court, "fundamental rights and liberties" are those "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (internal citations and quotation marks omitted).

Although the Supreme Court has characterized civil commitment as a "significant deprivation of liberty," Addington v. Texas, 441 U.S. 418, 425 (1979), it has never declared that persons who pose a significant danger to themselves or others possess a fundamental liberty interest in freedom from physical restraint. See Foucha v. Louisiana, 504 U.S. 71, 116 (1992) (Thomas, J., dissenting) (criticizing the majority's analysis of a due process challenge to a civil commitment statute because, "[f]irst, the Court never explains whether we are dealing here with a fundamental right, and . . . [s]econd, the Court never discloses what standard of review applies"). Rather, when considering the constitutionality of Kansas's Sexually Violent Predator Act, the Court stated "[a]lthough freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' that liberty interest is not absolute." Kansas v. Hendricks, 521 U.S. 346, 356 (1997) (quoting Foucha, 504 U.S. at 80). The Court noted that many states provide for the involuntary civil commitment of people who are unable to control their behavior and pose a threat to public health and safety, and "[i]t thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." Id. at 357 (citing Addington, 441 U.S. at 426). When considering the due process implications of a civil commitment case, the Supreme Court stated "[a]t the least, due process

-17-

requires that the nature and duration of commitment bear some *reasonable relation* to the purpose for which the individual is committed." Jackson v. Indiana, 406 U.S. 715, 738 (1972) (emphasis added).

Accordingly, the proper standard of scrutiny to be applied to plaintiffs' facial due process challenge is whether MCTA bears a rational relationship to a legitimate government purpose. See id.

ii. As-Applied Due Process

When it considered the proper standard to apply, the district court stated substantive due process protected against two types of government action: action that shocks the conscience or action that interferes with rights implicit in the concept of ordered liberty. The district court then proceeded to discuss how the state defendants' actions interfered with the class plaintiffs' liberty interests to be free from restraint and thus was subject to a strict scrutiny analysis. The district court applied the improper standard to consider an as-applied challenge when it determined there were two types of government action that could violate the class plaintiffs' substantive due process rights.

Following the Supreme Court's decision in County of Sacramento v. Lewis, 523 U.S. 833 (1998), this court held to prevail on an as-applied due process claim, that the state defendants' actions violated the plaintiffs' substantive due process rights, the plaintiffs "must demonstrate *both* that the [state defendants'] conduct was conscience-shocking, *and* that the [state defendants] violated one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" Moran v. Clarke, 296 F.3d 638, 651 (8th Cir. 2002) (en banc) (Bye, J., concurring and writing for a majority on this issue) (emphasis in original) (quoting Glucksberg, 521 U.S. at 720-21 (1997)). The district court, citing

-18-

to a pre-<u>Lewis</u> decision of <u>United States v. Salerno</u>, 481 U.S. 739, 746 (1987), used the former disjunctive standard and focused only on whether there was a fundamental right at issue, and having determined that there was a fundamental right at issue, the district court applied a strict scrutiny test to both the facial and as-applied challenges.

As indicated above, however, the court should determine both whether the state defendants' actions were conscience-shocking and if those actions violated a fundamental liberty interest. To determine if the actions were conscience-shocking, the district court should consider whether the state defendants' actions were "egregious or outrageous." <u>See</u> <u>Montin v. Gibson</u>, 718 F.3d 752, 755 (8th Cir. 2013) (quoting <u>Burton v. Richmond</u>, 370 F.3d 723, 729 (8th Cir. 2004)). To meet this high standard, we have explained that the alleged substantive due process violations must involve conduct "so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." <u>Moran</u>, 296 F.3d at 647 (quoting <u>In re Scott Cnty. Master Docket</u>, 672 F. Supp. 1152, 1166 (D. Minn. 1987)). Accordingly, the district court applied an incorrect standard in considering the class plaintiffs' as-applied substantive due process claims.

D. Substantive Due Process

i. Facial Challenge

The district court announced six grounds upon which MCTA was facially unconstitutional under the strict scrutiny standard—(1) MCTA did not require periodic risk assessments of all committed persons, (2) MCTA did not provide for a judicial bypass mechanism, (3) MCTA rendered discharge from MSOP more onerous than admission because discharge criteria was more stringent than admission criteria, (4) MCTA impermissibly shifted the burden to petition for a reduction in custody to

-19-

the committed person, (5) MCTA did not provide less restrictive alternatives although the statute indicated such would be available, and (6) MCTA did not require state officials to petition for a reduction in custody on behalf of committed individuals who might qualify for a reduction. As we held above, the appropriate standard is whether MCTA bears a reasonable relationship to a legitimate government purpose. To prevail in a facial challenge, the class plaintiffs bear the burden of "establish[ing] that no set of circumstances exists under which [MCTA] would be valid." See United States v. Salerno, 481 U.S. 739, 745 (1987). None of the six reasons the district court found MCTA facially unconstitutional under the strict scrutiny review survives the reasonable relationship review.

Reasonable relationship review is highly deferential to the legislature. No one can reasonably dispute that Minnesota has a real, legitimate interest in protecting its citizens from harm caused by sexually dangerous persons or persons who have a sexual psychopathic personality. See Addington, 441 U.S. at 426 ("[T]he state . . . has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill."). The question then is whether MCTA is reasonably related to this interest. The burden to prove the statute is not rationally related to a legitimate government interest is borne by the class plaintiffs, whereas the burden to show that a statute is narrowly tailored to serve a compelling government interest is borne by the state. See FCC v. Beach Comm'ns, Inc., 508 U.S. 307, 314-15 (1993) ("On rational-basis review, . . . those attacking the rationality of the legislative classification have the burden 'to negate every conceivable basis which might support it.'" (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)); Republican Party of Minn. v. White, 416 F.3d 738, 749 (8th Cir. 2005) ("The strict scrutiny test requires the state to show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest." (citations omitted)).

The Minnesota Supreme Court has had opportunity to consider whether the then-applicable Minnesota commitment statute violated due process. In <u>In re Blodgett</u>, 510 N.W.2d 910, 916 (Minn. 1994), that court held, "[s]o long as civil commitment is programmed to provide treatment and periodic review, due process is provided. Minnesota's commitment system provides for periodic review and reevaluation of the need for continued confinement." The next year, the Minnesota Supreme Court heard <u>Call v. Gomez</u>, 535 N.W.2d 312 (Minn. 1995), and considered a due process challenge to MCTA. Referring back to <u>Blodgett</u>, the court held, "once a person is committed, his or her due process rights are protected through procedural safeguards that include periodic review and re-evaluation, the opportunity to petition for transfer to an open hospital, the opportunity to petition for full discharge, and the right to competent medical care and treatment." <u>Id.</u> at 318-19.

MCTA is facially constitutional because it is rationally related to Minnesota's legitimate interests. The district court expressed concerns about the lack of periodic risk assessments, the availability of less restrictive alternatives, and the processes for seeking a custody reduction or a release. MCTA provides "proper procedures and evidentiary standards" for a committed person to petition for a reduction in his custody or his release from confinement. <u>See</u> <u>Hendricks</u>, 521 U.S. at 357. Any committed person can file a petition for reduction in custody. Minn. Stat. Ann. § 253D.27(2). The petition is considered by a special review board consisting of experts in mental illness and at least one attorney. Minn. Stat. Ann. § 253B.18(4c)(a). That panel conducts a hearing and issues a report with recommendations to a judicial appeal panel consisting of Minnesota district judges appointed to the judicial appeal panel by the Chief Justice of the Supreme Court. Minn. Stat. Ann. §§ 253D.27(3)-(4), 253B.19(1). Through this process, the committed person "has the right to be represented by counsel" and the court "shall appoint a qualified attorney to represent the committed person if neither the committed person nor other provide counsel." Minn. Stat. Ann. § 253D.20. Appeal of the decision of the special judicial panel may be taken the Minnesota Court of Appeals. Minn. Stat. Ann. §§ 253D.28, 253B.19(5).

Finally, a committed person is entitled to initiate a new petition six months after the prior petition is concluded. Minn. Stat. Ann. § 253D.27(2).

We conclude that this extensive process and the protections to persons committed under MCTA are rationally related to the State's legitimate interest of protecting its citizens from sexually dangerous persons or persons who have a sexual psychopathic personality. Those protections allow committed individuals to petition for a reduction in custody, including release; therefore, the statute is facially constitutional.

ii. As-Applied Challenge

We agree with the state defendants that much of the district court's "as-applied" analysis is not a consideration of the application of MCTA to the class plaintiffs but is a criticism of the statutory scheme itself. For instance, the court found that the statute was unconstitutional as applied to the plaintiffs because the state defendants do not conduct periodic risk assessments. However, the class plaintiffs acknowledge that MCTA does not require periodic risk assessments but those assessments are performed whenever a committed person seeks a reduction in custody. The district court also found as-applied violations in aspects of the treatment received by the committed persons, specifically concluding that the treatment program's structure has been an "institutional failure" and lacks a meaningful relationship between the program and an end to indefinite detention. However, we have previously held that although "the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." See Strutton v. Meade, 668 F.3d 549, 557 (8th Cir. 2012) (alteration in original) (quoting Elizabeth M. v. Montenez, 458 F.3d 779, 788 (8th Cir. 2006)). Further, as the Supreme Court recognized, the Constitution does not prevent "a State

from civilly detaining those for whom no treatment is available." <u>Hendricks</u>, 521 U.S. at 366. Nevertheless, as discussed previously, to maintain an as-applied due process challenge, the class plaintiffs have the burden of showing the state actors' actions were conscience-shocking and violate a fundamental liberty interest. <u>See</u> <u>Moran</u>, 296 F.3d at 651.

None of the six grounds upon which the district court determined the state defendants violated the class plaintiffs' substantive due process rights in an as-applied context satisfy the conscience-shocking standard. Having reviewed these grounds and the record on appeal, we conclude that the class plaintiffs have failed to demonstrate that any of the identified actions of the state defendants or arguable shortcomings in the MSOP were egregious, malicious, or sadistic as is necessary to meet the conscience-shocking standard. Accordingly, we deny the claims of an as-applied due process violation.

## III.

Accordingly, we reverse the district court's finding of a constitutional violation and vacate the injunctive order. We remand this matter to the district court for further proceedings on the remaining claims in the Third Amended Complaint.

_____